**[ORAL ARGUMENT NOT YET SCHEDULED]**

**13-7017**

# In the United States Court of Appeals for the District of Columbia Circuit

LARRY KLAYMAN,

*Plaintiff-Appellant,*

v.

MARK ZUCKERBERG AND FACEBOOK, INC.,

*Defendants-Appellees.*

On Appeal from the United States District Court for
the District of Columbia (Walton, J.)
Case No. 11-cv-874

**BRIEF FOR APPELLEES**

Craig S. Primis, P.C.
  *Counsel of Record*
K. Winn Allen
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, D.C. 20005
(202) 879-5000
cprimis@kirkland.com

*Counsel for Appellees*

September 25, 2013

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), counsel certifies as follows:

**A.   Parties and Amici**.   All parties, intervenors, and amici appearing before the district court and in this Court are listed in the Brief for Appellant.

**B.   Rulings Under Review.**   References to the ruling at issue appear in the Brief for Appellant.

**C.   Related Cases**.   Appellees are unaware of any related cases.

Dated: September 25, 2013

/s/ Craig S. Primis, P.C.
Craig S. Primis, P.C.
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, DC   20005
(202) 879-5000
cprimis@kirkland.com

*Counsel for Appellees*

i

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1, Facebook, Inc., submits the following corporate disclosure statement:

Facebook, Inc., is a publicly traded corporation principally engaged in providing and maintaining the world's largest social-networking service.  No parent corporation or publicly held corporation owns 10 percent or more of its stock.

# TABLE OF CONTENTS

**Page**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES...................................................................................i

CORPORATE DISCLOSURE STATEMENT............................................ii

TABLE OF AUTHORITIES ..................................................... v

GLOSSARY ...................................................................... x

STATEMENT OF ISSUES PRESENTED FOR REVIEW ...................... x

STATUTES AND REGULATIONS ......................................... x

INTRODUCTION ............................................................... 1

STATEMENT OF FACTS .......................................................2

SUMMARY OF ARGUMENT ..................................................6

ARGUMENT .....................................................................8

I.    Section 230 Of The Communications Decency Act Bars Mr. Klayman's Claims As A Matter Of Law ............................................8

    A.    Section 230 Immunizes Providers Of Interactive Computer Services From Liability For Content Created By Third-Party Users.................................8

    B.    Section 230 Bars Mr. Klayman's Claims As A Matter Of Law ...............................................................12

    C.    This Court Should Not Create An Unsupported Implied Exception To CDA Immunity ...............................26

    D.    The District Court Did Not Err By Determining CDA Immunity At The Pleading Stage.........................29

    E.    This Court Should Reject Mr. Klayman's Attempt To Inject New Facts Into The Record On Appeal. ....................30

II.   Notwithstanding § 230 Of The CDA, Appellant's Tort Claims
      Fail As A Matter Of Law ..................................................................31

      A.   The Assault Claim Fails As A Matter Of Law ......................32

      B.   Mr. Klayman's Claim For Negligence Fails As A
           Matter Of Law .......................................................................34

CONCLUSION ..........................................................................................36

CERTIFICATE OF COMPLIANCE .........................................................38

CERTIFICATE OF SERVICE....................................................................39

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*800-JR Cigar, Inc. v. GoTo.com, Inc.*,
   437 F. Supp. 2d 273 (D.N.J. 2006)................................................. 15

*Aas v. Superior Court*,
   12 P.3d 1125 (Cal. 2000) ............................................................ 35

*Barnes v. Yahoo!, Inc.*,
   570 F.3d 1096 (9th Cir. 2009) ................................ 21, 22, 27, 28, 29

*Ben Ezra, Weinstein, & Co. v. Am. Online Inc.*,
   206 F.3d 980 (10th Cir. 2000) ....................................................... 11

*Blumenthal v. Drudge*,
   992 F. Supp. 44 (D.D.C. 1998) ................................................. 11, 24

*Bhd. of R.R. Trainmen v. Balt. & Ohio R.R. Co.*,
   331 U.S. 519, 529 (1947) .............................................................. 28

*\*Carafano v. Metrosplash.com, Inc.*,
   339 F.3d 1119 (9th Cir. 2003) .................................... 10, 11, 13, 19

*Chappell-Johnson v. Powell*,
   440 F.3d 484 (D.C. Cir. 2006) ....................................................... 14

*Chase v. District of Columbia*,
   723 F. Supp. 2d 130 (D.D.C. 2010) .............................................. 31

*Colbert v. Potter*,
   471 F.3d 158 (D.C. Cir. 2006) ....................................................... 30

*Delgado v. Trax Bar & Grill*,
   113 P.3d 1159 (Cal. 2005) ............................................................ 34

\* Authorities upon which we chiefly rely are marked with asterisks.

v

*Dimeo v. Max,*
    433 F. Supp. 2d 523 (E.D. Pa. 2006)................................30

*DiMeo v. Max,*
    248 F. App'x 280 (3d Cir. 2007) ...................................16

*Dodd v. United States,*
    545 U.S. 353 (2005) ..................................................27

*Doe v. GTE Corp.,*
    347 F.3d 655 (7th Cir. 2003) .......................................29

*Doe v. MySpace, Inc.,*
    528 F.3d 413 (5th Cir. 2008) ...................................10, 13

*Doe v. MySpace, Inc.,*
    629 F. Supp. 2d 663 (E.D. Tex. 2009).............................30

*Fair Hous. Council of San Fernando Valley v. Roomates.Com, LLC,*
    521 F.3d 1157 (9th Cir. 2008) .......................................23

*Finkel v. Facebook, Inc.,*
    No. 102578/09, 2009 WL 3240365
    (N.Y. Sup. Ct. Sep. 15, 2009) .................................12, 14

*Gaston v. Facebook, Inc.,*
    2012 WL 629868 (D. Oregon Feb. 2, 2012)..........................11, 14

*Global Royalties, Ltd. v. Xcentric Ventures, LLC,*
    544 F. Supp. 2d 929 (D. Ariz. 2008)...............................30

*Goddard v. Google, Inc.,*
    640 F. Supp. 2d 1193 (N.D. Cal. 2009) ..........................23, 29

*\*Green v. Am. Online (AOL),*
    318 F.3d 465 (3d Cir. 2003)................................18, 19, 21

*Halberstam v. Welch,*
    705 F.2d 472 (D.C. Cir. 1983) .....................................32

*Hinton v. Corrs. Corp. of Am.,*
    624 F. Supp. 2d 45 (D.D.C. 2009) ..................................31

*Inman v. Technicolor USA, Inc.*,
  No. 11-666, 2011 WL 5829024 (W.D. Pa. Nov. 18, 2011) ............. 16

*Johnson v. Arden*,
  614 F.3d 785 (8th Cir. 2010) .................................................... 10, 18

*Landstar Express Am., Inc. v. Fed. Mar. Comm'n*,
  569 F.3d 493 (D.C. Cir. 2009) ....................................................... 27

*Langdon v. Google, Inc.*,
  474 F. Supp. 2d 622 (D. Del. 2007) ................................................ 16

*Levitt v. Yelp! Inc.*,
  Nos. 10-1321, 10-2351, 2011 WL 5079526
  (N.D. Cal. Oct. 26, 2011) ............................................................... 24

*Marconi v. Officer One*,
  No. 05-1978, 2006 WL 2827862 (N.D. Cal. 2006) ......................... 33

*McKethean v. Wash. Metro. Area Transit Auth.*,
  588 A.2d 708 (D.C. 1991) ............................................................... 34

*Miles v. Raycom Media, Inc.*,
  No. 1:09CV713, 2010 WL 3419438 (S.D. Miss. 2010) ................... 30

*Mmubango v. Google, Inc.*,
  No. 12-1300, 2013 WL 664231 (E.D. Pa. Feb. 22, 2013) ............... 16

*Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*,
  591 F.3d 250 (4th Cir. 2009) .......................................... 10, 24, 29

*Parisi v. Sinclair*,
  774 F. Supp. 2d 310 (D.D.C. 2011) ............................................... 11

*Plotnik v. Meihaus*,
  208 Cal. App. 4th 1590 (Cal. Ct. App. 2012) ................................ 33

*Ramey v. Darkside Prods., Inc.*,
  No. 02-730, 2004 WL 5550485 (D.D.C. May 17, 2004) ................. 11

*Randolph v. ING Life Ins. & Annuity Co.*,
  973 A.2d 702 (D.C. 2009) .............................................................. 35

*Rosen v. State Farm Gen. Ins. Co.*,
  70 P.3d 351 (Cal. 2003) ................................................................ 35

*Saunders v. Nemati*,
  580 A.2d 660 (D.C. 1990) ............................................................ 33

*Sindell v. Abbott Labs.*,
  607 P.2d 924 (Cal. 1980) ............................................................. 32

*Swift v. Zynga Game Network Inc.*,
  No. 09-05443, 2010 WL 4569889 (N.D. Cal. Nov. 3, 2010)......25, 26

*Tetreau v. Facebook, Inc.*,
  No. 10-4558-CZ (Mich. Super. Ct. Feb. 23, 2011) ...................11, 14

*Universal Commc'n Sys., Inc. v. Lycos, Inc.*,
  478 F.3d 413 (1st Cir. 2007)......................................11, 13, 15, 25

*Young v. Facebook, Inc.*,
  No. 5:10-cv-03579, 2010 WL 4269304
  (N.D. Cal. Oct. 25, 2010) ........................................................21, 35

*Zeran v. Am. Online, Inc.*,
  129 F.3d 327 (4th Cir. 1997) ..............................9, 10, 12, 18, 19, 25

**Statutes**

47 U.S.C. § 223.............................................................................ix

47 U.S.C. § 230.............................................................................ix

*47 U.S.C. § 230(c)(1) ...........................................10, 13, 22, 27

47 U.S.C. § 230(c)(2) ...........................................................27

*47 U.S.C. § 230(e)(3) ...............................................................9

47 U.S.C. § 230(f)(2).......................................13, 14, 15, 17

47 U.S.C. § 230(f)(3).......................................22, 23, 24, 25

**Treatises**

Restatement (Second) of Torts § 29(1) (1965) ........................................34

Restatement (Second) of Torts § 31 (1965)............................................33

Restatement (Second) of Torts § 876 (1979)....................................32, 33

## GLOSSARY

The abbreviation "CDA" refers to the Communications Decency Act of 1996, 110 Stat. 133, codified at 47 U.S.C. §§ 223, 230.

The abbreviation "SRR" refers to the Statement of Rights and Responsibilities to which all users of Facebook agree. The Statement of Rights and Responsibilities defines the terms of service for Facebook. *See* Motion to Dismiss, Ex. A (J.A. at __).

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1.    Whether § 230 of the CDA bars Mr. Klayman's claims for assault and negligence.

2.    Whether, irrespective of the application of § 230, Mr. Klayman's claims for assault and negligence fail as a matter of law.

## STATUTES AND REGULATIONS

Relevant statutes and regulations are reproduced in the Addendum to this brief.

x

### INTRODUCTION

Larry Klayman brought suit against Appellees seeking damages "in excess of $1,000,000,000.00 (One Billion Dollars)" for injury he allegedly suffered when he read content posted on Facebook by third-party users.  *See* Compl. at 7 (J.A. at __).  The district court dismissed his complaint under the plain terms of § 230 of the Communications Decency Act of 1996 ("CDA").  This Court should affirm that ruling.

It is well established that § 230 of the CDA bars all claims seeking to hold internet companies like Facebook liable for speech or information posted on their service by third-party users.  That broad immunity promotes the free exchange of information and ideas over the Internet and prevents the inevitable chill of speech that would occur if interactive computer services could be held liable merely for serving as conduits for other parties' speech.  Indeed, this lawsuit is precisely the type of action the CDA was enacted to curb.

Even if the CDA did not apply (and it plainly does), this Court could affirm on the alternative ground that Mr. Klayman's tort-law claims fail as a matter of law.  It is a longstanding principle of the common law that alleged verbal threats to cause harm in the future do

1

not constitute civil assault. The negligence claim fares no better: it fails because Facebook had no duty to shield Mr. Klayman from the allegedly offensive speech of other Facebook users and because he has not alleged any actual injury.

For these reasons, and for those explained below, this Court should affirm the dismissal of Mr. Klayman's complaint.

## STATEMENT OF FACTS

This case arises out of Mr. Klayman's use of the online social-networking services provided by Facebook. Facebook allows users to share content with others, including articles, photographs, news about family and friends, and opinions about world events. Users can also view content shared by other Facebook users on one or more of the hundreds of millions of Facebook pages. *See generally* Compl. ¶ 4 & p. 7 (J.A. at ___). To access Facebook, a user must open an account and agree to abide by the terms of service, including a Statement of Rights and Responsibilities (hereinafter, "SRR"). *See* Motion to Dismiss, Ex. A (J.A. at ___). Facebook is, and always has been, a free service. Mr. Zuckerberg, a named codefendant in this case, is the founder and Chief Executive Officer of Facebook. *See* Compl. ¶¶ 4, 7 (J.A. at ___).

2

The Appellant—Larry Klayman—claims to be a "highly visible and well known lawyer, advocate, writer, television and radio commentator, and public figure." *Id*. ¶ 11 (J.A. at __). He alleges that he is "a recognized expert on terrorism and the Middle East" who is "widely known in the Muslim/Arabic world for his support of Israel and has been called by it a 'Zionist.'" *Id*. As an attorney and the Chairman and General Counsel of an organization called Freedom Watch, *id*. ¶¶ 2, 11 (J.A. at __), Mr. Klayman alleges that his activities have resulted in him being "branded publicly . . . to the Muslim/Palestinian world [as] an enemy of Islam in the New York Post, all over the internet and in other publications read by Palestinians and other radical Muslims in particular," *id*. ¶ 11 (J.A. at __).

Mr. Klayman maintains a Facebook account. *Id*. ¶ 6 (J.A. at __). Mr. Klayman claims that, while using his Facebook account, he "encountered the Facebook page titled 'Third Palestinian Intifada'" (hereinafter, the "Third Intifada Page"), which was created by a third-party Facebook user. *Id*. ¶ 7 (J.A. at __). Although the page contained no reference to Mr. Klayman, he alleged that it contained several statements advocating violence against those of Jewish faith. For

3

example, Mr. Klayman alleged that the page "advocate[d] an intifada against and thus death to persons of Jewish origin," *id.* ¶ 8 (J.A. at \_\_), and "featured 'wild incitement' with call[s] to kill Jews and talk of liberating Jerusalem through violence," *id.* ¶ 7 (J.A. at \_\_).

Mr. Klayman does not allege that he ever contacted Facebook regarding the Third Intifada Page or asked Facebook to remove the page. Instead, the complaint alleges that the Public Diplomacy Minister of Israel wrote a letter to Facebook requesting that Facebook "take down the [Third Intifada Page] and similar and related pages." *Id.* Mr. Klayman concedes that Facebook did in fact remove the Third Intifada Page. *Id.* ¶ 12 (J.A. at \_\_). He nonetheless alleges that Facebook "refused for many days" to remove the page and only did so "begrudgingly." *Id.*

Following the removal of the Third Intifada Page, Mr. Klayman initiated this action against Facebook and its CEO (collectively, "Facebook") seeking over $1,000,000,000 in compensatory and punitive damages. *Id.* at p. 7 (J.A. at \_\_). The complaint includes two specific claims for relief. Count I is a claim for civil assault in which Mr. Klayman alleges that reading the Third Intifada Page caused him to

4

suffer a "reasonable apprehension of severe bodily harm and/or death." *Id.* ¶ 16 (J.A. at ___). Although he never alleges that the Third Intifada Page threatened him specifically, he alleges that the "violent history of Intifadas . . . amount to a threat of the use of force" against Jews around the world. *Id.* ¶ 15 (J.A. at ___). Count II is a common-law negligence claim wherein Mr. Klayman alleges that Facebook and Mr. Zuckerberg "owed [him] a duty of care, which they violated and breached by allowing and furthering the death threats by the Third Palestinian Intifada." *Id.* ¶ 19 (J.A. at ___).

The district court (Walton, J.) dismissed Mr. Klayman's complaint. The lower court held that Mr. Klayman's claims were barred by § 230 of the CDA, which "immunizes internet computer service providers from liability for the publication of information or speech originating from third parties." Dist. Ct. Op. at 6 (J.A. at ___). That statute applied, the district court held, because (i) Facebook provides an "interactive computer service," *id.* at 7 (J.A. at ___); (ii) Mr. Klayman was seeking to hold Facebook liable as a "publisher or speaker" of the content on the Third Intifada Page, *id.* at 9 (J.A. at ___); and (iii) Facebook was not responsible for the "creation or development" of the content on the

5

Third Intifada Page, *id.* at 11 (J.A. at __).  The district court thus held that Facebook is "immune to suit in accordance with the CDA, and the Court must grant the . . . motion to dismiss." *Id.* at 12 (J.A. at __).  Mr. Klayman subsequently appealed the district court's ruling to this Court.

## SUMMARY OF ARGUMENT

This Court should affirm the lower court and hold that § 230 of the CDA bars Mr. Klayman's claims as a matter law.  Section 230 bars any claim (i) against a provider of an "interactive computer service"; (ii) that seeks to treat that service provider as the "publisher" of third-party content; and (iii) where the service provider did not participate in creating the offensive content.

Each of those three elements is satisfied here.  Facebook, as numerous courts have held, plainly qualifies as a provider of an "interactive computer service."  And by trying to impose liability on Facebook for not removing the Third Intifada Page for several days, Mr. Klayman necessarily seeks to treat Facebook as the "publisher" of that content.  Mr. Klayman's complaint also contains no plausible allegations showing that Facebook participated in any way in creating

the content on the Third Intifada Page. For those reasons, the district court correctly determined that the complaint is barred by § 230.

In an effort to escape this straightforward application of the statutory text, Mr. Klayman argues that this Court should imply a "public policy" exception to CDA immunity for service providers that do not regulate third-party content posted on their sites. But nothing in the text of the CDA or the numerous Courts of Appeals decisions interpreting the CDA suggests that any such implied exception exists. In any event, such an exception would not apply in this case. As Facebook's terms of service make plain, Facebook can and does engage in self-regulatory efforts, voluntarily removing content that it determines is in violation of its policies—as it did here. *See* Compl. ¶ 12 (J.A. at __).

Although affirming the district court's finding of CDA immunity means that the Court need not address Mr. Klayman's lengthy arguments in defense of the underlying merits of his claims, doing so only confirms that Mr. Klayman's allegations are without merit. Mr. Klayman's claim for assault fails because Facebook cannot be treated as a joint tortfeasor and because alleged threats to cause bodily harm to a

diffuse group of people at some point in the future do not amount to common law assault. In addition, Mr. Klayman's negligence claim fails because Facebook had no duty to protect him from the alleged threats of others and because he has not alleged any actual injury stemming from the threats on the Third Intifada Page.

## ARGUMENT

## I.    Section 230 Of The Communications Decency Act Bars Mr. Klayman's Claims As A Matter Of Law

Section 230 bars any cause of action that seeks to hold an interactive-computer-service provider liable for failing to remove or screen content created by a third-party user of the service. Because Mr. Klayman's claims seek to impose the exact type of liability that the CDA forbids, this Court should affirm the district court's decision dismissing his complaint as a matter of law.

### A.    Section 230 Immunizes Providers Of Interactive Computer Services From Liability For Content Created By Third-Party Users

Section 230(c)(1) of the CDA states that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). Section 230(e)(3), in turn, gives that

8

provision teeth by expressly preempting any cause of action that would hold an interactive-computer-service provider liable as a speaker or publisher of speech provided by others:  "No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section."  *Id.* § 230(e)(3).

The broad immunity of § 230 serves important policy goals.  Most significantly, § 230 "maintain[s] the robust nature of Internet communication," by eliminating "the threat that tort-based lawsuits pose to freedom of speech."  *Zeran v. Am. Online, Inc.*, 129 F.3d 327, 330 (4th Cir. 1997).  As the Fourth Circuit has explained:

> It would be impossible for service providers to screen each of their millions of postings for possible problems.  Faced with potential liability for each message republished by their services, interactive computer service providers might choose to severely restrict the number and type of messages posted. Congress considered the weight of the speech interests implicated and chose to immunize service providers to avoid any such restrictive effect.

*Id.* at 331.

In addition to promoting the free exchange of information on the Internet, § 230 also removes disincentives to self-regulation by assuring service providers that they can safely self-police their online presence for offensive material without fear that their editorial choices might

9

subject them to liability. *Id.*; *see also Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1122 (9th Cir. 2003) ("Congress enacted this provision . . . to promote the free exchange of information and ideas over the Internet and to encourage voluntary monitoring for offensive or obscene material.").

Numerous Courts of Appeals have recognized that § 230(c)(1) bars claims seeking to hold a provider of an Internet-based service, such as Facebook, liable for speech or information posted on the service by a third-party user. *See, e.g.*, *Johnson v. Arden*, 614 F.3d 785, 790–91 (8th Cir. 2010) ("Read together, the[] provisions [of § 230] bar plaintiffs from holding ISPs legally responsible for information that third parties created and developed."); *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 254 (4th Cir. 2009) ("[In the CDA,] Congress . . . established a general rule that providers of interactive computer services are liable only for speech that is properly attributable to them."); *Doe v. MySpace, Inc.*, 528 F.3d 413, 418 (5th Cir. 2008) ("Congress provided broad immunity under the CDA to Web-based service providers for all claims stemming from their publication of information created by third parties . . . ."); *Universal Commc'n Sys.,*

10

*Inc. v. Lycos, Inc.*, 478 F.3d 413, 415, 418–19 (1st Cir. 2007) (similar); *Carafano*, 339 F.3d at 1123 (similar); *Ben Ezra, Weinstein, & Co. v. Am. Online Inc.*, 206 F.3d 980, 984–86 (10th Cir. 2000) (similar).

District courts in this Circuit have likewise applied § 230 to reject claims seeking to impose liability on service providers for third-party content. *See Parisi v. Sinclair*, 774 F. Supp. 2d 310, 315 (D.D.C. 2011) (concluding that § 230 bars tort claims against online booksellers relating to allegedly defamatory promotional statements posted by third parties); *Ramey v. Darkside Prods., Inc.*, No. 02-730, 2004 WL 5550485, at *5–6 (D.D.C. May 17, 2004) (similar); *Blumenthal v. Drudge*, 992 F. Supp. 44, 49 (D.D.C. 1998) (similar).  Indeed, several courts have applied the CDA to dismiss suits against Facebook specifically in circumstances very similar to those presented in this case. *See Gaston v. Facebook, Inc.*, No. 3:12-cv-0063, 2012 WL 610005 (D. Or. Feb. 24, 2012) (adopting the findings and recommendation of the magistrate judge that Facebook was entitled to § 230 immunity where plaintiff alleged that another Facebook user allegedly defamed him on her Facebook page); Order at 1, *Tetreau v. Facebook, Inc.*, No. 10-4558 (Mich. Cir. Ct. Feb. 23, 2011) (dismissing defamation and tort claims

11

because "Facebook is a provider of an interactive computer service and entitled to immunity under the [CDA]"); *Finkel v. Facebook, Inc.*, No. 102578/09, 2009 WL 3240365 (N.Y. Sup. Ct. Sept. 15, 2009) (same).

The robust protection § 230 affords to interactive-computer-service providers does not mean that parties alleging injury from online speech are left without a remedy: the third-party speakers themselves could still be liable for unlawful speech. *See, e.g.*, *Zeran*, 129 F.3d at 330 ("None of this means, of course, that the original culpable party who posts defamatory messages would escape accountability."). But Congress made the policy choice "not to deter harmful online speech through the separate route of imposing tort liability on companies that serve as intermediaries for other parties' potentially injurious messages." *Id.* at 330–31.

### B.     Section 230 Bars Mr. Klayman's Claims As A Matter Of Law

Applying these well-established principles, this Court should affirm the dismissal of Mr. Klayman's claims because (1) Facebook is a "provider . . . of an interactive computer service"; (2) Mr. Klayman is attempting to hold Facebook liable as the "publisher or speaker" of content; and (3) the allegedly harmful content was "provided by another

12

information content provider" and not by Facebook.   47 U.S.C.
§ 230(c)(1); *see also Lycos*, 478 F.3d at 418.

> 1.   Facebook Provides An Interactive Computer Service

It cannot seriously be doubted that Facebook is a "provider" of an
"interactive computer service."  47 U.S.C. § 230(c)(1).  The CDA broadly
defines "interactive computer service" as "any information service,
system, or access software provider that provides or enables computer
access by multiple users to a computer server."  *Id*. § 230(f)(2); *see also
Carafano,* 339 F.3d at 1123 ("[R]eviewing courts have . . . adopt[ed] a
relatively expansive definition of 'interactive computer service . . . .'").
The services provided by Facebook meet that description because
Facebook, through its website and mobile applications, allows users
from around the world to access Facebook's servers for the purpose of
posting and sharing data with others.  *See, e.g.*, Compl. ¶ 4 (J.A. at __)
(alleging that Facebook "engages in social networking via the internet").
Indeed, courts have held that social-networking services constitute
interactive-computer-service providers protected by § 230(c), *see
MySpace*, 528 F.3d at 415 (affording § 230 immunity to a "Web-based
social network"), and that Facebook in particular is a provider of an

13

interactive computer service within the meaning of the CDA, *see Gaston*, 2012 WL 629868, at *6-7 (holding that Facebook qualifies as an interactive-computer-service provider); *Tetreau* at 1, No. 10-4558 (same); *Finkel*, No. 102578/09, 2009 WL 3240365 (same).

For the first time on appeal, Mr. Klayman argues that Facebook "do[es] not meet th[e] definition" of an "interactive computer service," Br. of Appellant at 20, and thus that "this requirement of the CDA is clearly not satisfied," *id*. at 22. Mr. Klayman's failure to raise this argument below constitutes waiver, which alone provides sufficient grounds for this Court to reject it. *See, e.g.*, *Chappell-Johnson v. Powell*, 440 F.3d 484, 489 (D.C. Cir. 2006). In any event, neither of the reasons Mr. Klayman gives for why Facebook allegedly fails to qualify as an "interactive computer service" is persuasive.

*First*, Mr. Klayman argues that Facebook is not an "interactive computer service" because it does not "provide[] access to the Internet." Br. of Appellant at 20. Although § 230(f)(2) references "service[s] . . . that provide[] access to the Internet" as one group of potential defendants entitled to CDA immunity, the definition of "interactive computer service" is not limited to those services. Instead,

14

§ 230(f)(2)'s definition reaches much more broadly to include "*any* Information service" that "provides or enables computer access by multiple users to a computer server."  As the First Circuit held in rejecting the argument Mr. Klayman advances here, the CDA grants immunity to any service that "enables computer access by multiple users to . . . the server that hosts the web site" or mobile application, not just to those services that provide access to the internet.  *Lycos*, 478 F.3d at 419 (citation and internal quotation marks omitted).

The only authority Mr. Klayman cites for his misreading of the statute is a single district-court decision from outside this Circuit that denied CDA protection to a website because it "d[id] not provide access to the Internet like service providers such as AOL."  *800-JR Cigar, Inc. v. GoTo.com, Inc.*, 437 F. Supp. 2d 273, 295 (D.N.J. 2006).  But the defendant in that case cited only a single, unpublished, California-state-court case to support its claim to CDA immunity, *see id.*, and thus the court did not have before it the extensive case law cited above.  Perhaps for that reason, *800-JR Cigar* is inconsistent with the reasoning of every Court of Appeals to address this issue—including the Third Circuit and other district courts within that circuit.  *See DiMeo v. Max*,

15

248 F. App'x 280, 281–82 (3d Cir. 2007) (concluding that "a website . . . that allows users to write comments on various topics on message boards" qualified as an interactive computer service); *see also Mmubango v. Google, Inc.*, No. 12-1300, 2013 WL 664231, at \*2 (E.D. Pa. Feb. 22, 2013) (finding "Google fits the definition of an interactive computer service provider"); *Inman v. Technicolor USA, Inc.*, No. 11-666, 2011 WL 5829024, at \*7 (W.D. Pa. Nov. 18, 2011) (extending CDA protection to eBay); *Langdon v. Google, Inc.*, 474 F. Supp. 2d 622, 631 (D. Del. 2007) ("Section 230 provides Google, Yahoo, and Microsoft immunity for their editorial decisions regarding screening and deletion from their network.").

*Second*, Mr. Klayman argues that Facebook does not qualify as an "interactive computer service" because, unlike "companies such as AOL that cannot possibility control the content on their servers for all their customers," Facebook purportedly "can control the contents posted on [its] website" and "remove any content that is inappropriate or, as in this case, dangerous." Br. of Appellant at 21. The statutory test for whether an Internet-based service qualifies as an "interactive computer service," however, does not turn on whether or not the service can

16

"control the contents posted on [its] website." That is why Mr. Klayman has identified no authority from any jurisdiction that would support engrafting that extra-statutory requirement onto the definition in § 230(f)(2). At bottom, Facebook plainly qualifies as a provider of an "interactive computer service"—a fact that numerous other courts have recognized.[1]

### 2.  The Complaint Treats Facebook As The Publisher Or Speaker Of The Content On The Third Intifada Page

As the district court correctly recognized, Mr. Klayman is seeking to treat Facebook as the "publisher or speaker" of the content found on the Third Intifada Page and "related and similar pages on Facebook." *See* Compl. ¶ 8. (J.A. at __). Mr. Klayman's tort claims are premised on Facebook's alleged decision not to remove the Third Intifada Page immediately upon being asked to do so. *See id.* ¶ 7 (J.A. at __) (alleging that "[d]efendants refused" to "take down the page"); *id.* ¶ 12 (J.A. at __) ("When Mark Zuckerberg and Facebook were initially asked to remove the Intifada FB Page and related pages, they refused for many days.").

---

[1] As a practical matter, Facebook—which has over one billion users—can no more "control the contents posted on [its] website" than AOL, which has substantially fewer members.

Whether and when to remove or exclude content posted by a third-party user falls at the very core of a publisher's traditional editorial function. *See, e.g.*, *Green v. Am. Online (AOL)*, 318 F.3d 465, 471 (3d Cir. 2003) (finding that "the monitoring, screening, and deletion of content from [a] network" are "actions quintessentially related to a publisher's role"); *Zeran*, 129 F.3d at 332 (recognizing that "the failure to remove [a defamatory] statement when first communicated by another party . . . . constitute[s] publication"). Indeed, Mr. Klayman *himself* concedes that a "publisher within the meaning of the CDA" is "one who review[s], edit[s], and decid[es][] whether to publish *or to withdraw from publication* third-party content." Br. of Appellant at 23 (quotations omitted; emphasis added).

Because deciding whether and when to remove content constitutes traditional "publishing" conduct, courts routinely hold that § 230 bars claims—like those asserted by Mr. Klayman in this case—premised on the alleged failure of an interactive-computer-service provider to remove objectionable content. *See Johnson*, 614 F.3d at 788 (reasoning that § 230 barred suit where plaintiffs "requested all defendants to remove . . . statements [from their website] but . . . the statements were

18

not removed for more than 48 hours"); *Carafano*, 339 F.3d at 1122, 1125 (concluding that § 230 barred suit claiming that website did not quickly enough remove a website containing allegedly defamatory statements); *Green*, 318 F.3d at 471 (deciding that § 230 barred suit claiming that AOL "fail[ed] to address certain harmful content on its network"); *Zeran*, 129 F.3d at 328 (dismissing suit claiming "AOL unreasonably delayed in removing defamatory messages posted by an unidentified third party").

Attempting to circumvent that result, Mr. Klayman argues that Facebook "is liable under a contracts theory, not from [its] status or conduct as a publisher or speaker." Br. of Appellant at 24. As he tells it, his suit is really for breach of "the contractual relationship between the parties" which arose from the SRR to which Mr. Klayman agreed when he opened a Facebook account. *Id.* That SRR, he argues, contained a "promise" from Facebook that it would "take [] timely action upon notice of the threatening messages" on the Third Intifada Page, and Facebook purportedly breached that "contractual obligation[]" when it "failed to take any action whatsoever." *Id.*

19

But Mr. Klayman has *never pleaded* a claim for breach of contract, and has instead asserted only tort-law claims for assault and negligence. Indeed, the first time Mr. Klayman raised the possibility of contractual liability was in his opposition brief to Facebook's motion to dismiss. *See* Oppos. to Motion to Dismiss at 15 (J.A. at __). This Court should not permit Mr. Klayman to recast his state-law tort claims as contract claims, particularly after Mr. Klayman "fail[ed] to amend his complaint when given the opportunity to do so." *See* Dist. Ct. Op. at 10 (J.A. at __); *id.* ("[T]he Court declines to entertain the plaintiff's attempt to essentially re-fashion his complaint to now include a claim for breach of contract.").

Any breach-of-contract claim that Mr. Klayman could assert, moreover, would be futile and subject to dismissal as a matter of law. The SRR on which Mr. Klayman relies for his "contracts theory" plainly imposes no contractual "duty" to protect Mr. Klayman or any other Facebook user from potentially offensive content posted by other users. To the contrary, the SRR goes to great lengths to *disclaim* any such duty to do so: "WE DO NOT GUARANTEE THAT FACEBOOK WILL BE SAFE OR SECURE"; "FACEBOOK IS NOT RESPONSIBLE FOR

20

THE ACTIONS, CONTENT, INFORMATION, OR DATA OF THIRD PARTIES." *See* Motion to Dismiss, Ex. A, § 15.3 (J.A. at __, § 15.3) (emphasis in original). Such explicit disclaimers defeat a breach-of-contract claim (or other similar claim) premised on an interactive-computer-service provider's alleged contractual "duty" to screen third-party content. *See, e.g., Green*, 318 F.3d at 472 (rejecting breach-of-contract claim because "by their terms, the [AOL] Member Agreement and Community Guidelines were not intended to confer any rights on Green and AOL did not promise to protect Green from the acts of other subscribers"); *Young v. Facebook, Inc.*, No. 5:10-cv-03579, 2010 WL 4269304, at *5 (N.D. Cal. Oct. 25, 2010) (holding that the SRR imposed no duty on Facebook with respect to the content posted by Facebook users).[2]

The sole authority on which Mr. Klayman relies for his "contracts exception" to CDA immunity—*Barnes v. Yahoo!, Inc.*, 570 F.3d 1096 (9th Cir. 2009)—undermines rather than supports his argument. The

---

[2] As Mr. Klayman acknowledges, Compl. ¶ 12 (J.A. at __), Facebook did remove the Third Intifada Page. It did so, however, because the page violated Facebook's user-content policies—not because it was under any contractual or other legal obligation to do so.

court in *Barnes* dismissed a common-law negligence claim closely akin to that asserted in this case, holding that "section 230(c)(1) [of the CDA] precludes liability." *Id*. at 1102. And it allowed a promissory estoppel claim to proceed only because a Yahoo! employee expressly made a verbal promise to the plaintiff that the specific objectionable content would be removed—a fact not present in this case. *See id*. at 1099, 1109.

        3.   Facebook Did Not Create The Content On The Third Intifada Page

The final requirement for CDA immunity is that the offensive statements forming the basis for the plaintiff's claims must have been provided by a third-party "information content provider," and not by the interactive-computer-service provider itself. 47 U.S.C. § 230(c)(1)). An interactive-computer-service provider qualifies as an "information content provider" only if it is "responsible, in whole or in part, for the creation or development" of the offending content. *Id*. § 230(f)(3). Facebook had nothing to do with "creat[ing]" or "develop[ing]" the content found on the Third Intifada Page or any other similar Facebook page, and the complaint contains no contrary allegation. *Id*. Thus, this prong of the CDA test is also plainly satisfied.

Nonetheless, on appeal, Mr. Klayman argues that Facebook qualifies as an "information content provider" of the statements on the Third Intifada Page because Facebook (i) provides tools for users to share content with their friends and (ii) did not timely remove the Third Intifada Page upon request. *See* Br. of Appellant at 25-28. Neither argument has merit.

*First*, as Mr. Klayman himself acknowledges, *id.* at 25, the provision of "neutral tools" that enable the sharing of content is insufficient to deem Facebook an "information content provider." *See, e.g.*, *Fair Hous. Council of San Fernando Valley v. Roomates.com, LLC*, 521 F.3d 1157, 1174 (9th Cir. 2008) (en banc) (concluding that a service provider was not responsible for creation or development of content that "comes entirely from subscribers and is passively displayed by [the service provider]"); *Goddard v. Google, Inc.*, 640 F. Supp. 2d 1193, 1196 (N.D. Cal. 2009) (reasoning that a website was not an information content provider "when it merely provides third parties with neutral

23

tools to create web content, even if the website knows that the third parties are using such tools to create illegal content").[3]

Although Mr. Klayman argues that Facebook should be treated as an information content provider because it makes "suggestions" to Facebook users and allows third parties to "sponsor" information shared by Facebook users, *see* Br. of Appellant at 26, neither of those practices involves the "creation or development" of content.  47 U.S.C. § 230(f)(3).  Instead, those tools enable users to make *their own* content that they can then share with other Facebook users.  In any event, Mr. Klayman's

---

[3] Indeed, many courts have held that interactive-computer-service providers retain CDA immunity even when they do far more than simply "publish" content.  *See, e.g.*, *Nemet*, 591 F.3d at 257–58 (website entitled to CDA immunity even though it solicited consumers to post complaints on the website, "steered" those complaints into specific categories, contacted consumers to "ask questions about" complaints, and helped edit and revise certain complaints) (quotations omitted); *Levitt v. Yelp! Inc.*, Nos. 10-1321, 10-2351, 2011 WL 5079526, at *6 (N.D. Cal. Oct. 26, 2011) (holding that Yelp! was entitled to CDA immunity even though it "manipulate[ed]" user-generated content by removing certain business reviews, changing the order in which business reviews appeared, and aggregating business reviews to create a "star rating" for each business); *Drudge*, 992 F. Supp. at 51 (holding that AOL was entitled to CDA immunity even though AOL had the right to "require reasonable changes" to content).  This case, therefore, falls well within the mainstream of those instances in which courts find interactive-computer-service providers to be immunized under the CDA.

complaint does not allege that Facebook (much less anyone else) made any "suggestions" to any users that impacted the content on the Third Intifada Page or that Facebook "sponsored" the Third Intifada Page.

*Second*, there is no merit to the argument that a service provider's alleged delay in *removing* third-party content from its service is somehow equivalent to "creat[ing] or develop[ing]" that content in the first instance. *Id.* To the contrary, "[i]t is, by now, well established" that failing to remove allegedly offensive content of which the service provider has notice is "not enough to make it the service provider's own speech." *Lycos*, 478 F.3d at 420; *see also Zeran*, 129 F.3d at 328 (rejecting the argument that "§ 230 leaves intact liability for interactive computer service providers who possess notice of defamatory material posted through their services").[4]

---

[4] Nor is this case comparable to *Swift v. Zynga Game Network Inc.*, 2010 WL 4569889 (N.D. Cal. Nov. 3, 2010)—the principal case on which Mr. Klayman relies. Unlike *Zynga*, which was alleged to have entered into a business relationship with third parties to develop the allegedly fraudulent statements at issue, *id.* at *4–5, Mr. Klayman does not allege that Facebook has any relationship (business or otherwise) with the authors of the Third Intifada Page or any similar Facebook pages. Instead, Facebook "is a 'neutral' website that merely allows third parties to post" content—precisely the kind of service that *Zynga* acknowledged would be entitled to CDA immunity. *See id.* at *5–6.

### C. This Court Should Not Create An Unsupported Implied Exception To CDA Immunity

Unable to escape the plain language of the statute and the extensive body of case law applying it, Mr. Klayman resorts to arguing that this Court should rely on "legislative intent" and "public policy concerns" to create an implied "exception to immunity" in cases involving "interactive computer services that do not screen any third-party content whatsoever." Br. of Appellant at 17 (font altered).

Even if the statute were rewritten according to Mr. Klayman's preferences, such an exception would be inapplicable here. The SRR and Community Standards on Content, upon which Mr. Klayman repeatedly relies in his brief, *see* Br. of Appellant at 12, 21, 24, 37, indicate that Facebook can and does engage in self-regulatory efforts, voluntarily removing content that it determines is in violation of its policies, *see* Motion to Dismiss, Ex. A §§ 3, 5.2, 15.3 (J.A. at ___, §§ 3, 5.2, 15.3). Further, the complaint itself *alleges* that Facebook *did* remove the Third Intifada Page, *see* Compl. ¶ 12, an action that is incompatible with Mr. Klayman's contention that Facebook has no practice of "self-regulation."

26

More fundamentally, however, this Court and the Supreme Court have repeatedly rejected efforts to rewrite the plain language of statutes based on presumed legislative intent or public-policy concerns. *See Dodd v. United States*, 545 U.S. 353, 359 (2005) ("[W]e are not free to rewrite the statute that Congress enacted. When the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms.") (internal quotations and alterations omitted); *Landstar Express Am., Inc. v. Fed. Mar. Comm'n*, 569 F.3d 493, 498 (D.C. Cir. 2009) ("As the Supreme Court has repeatedly explained, [] neither courts nor federal agencies can rewrite a statute's plain text to correspond to its supposed purposes.").

Section 230(c)(1)—the provision at issue in this case—affords immunity to interactive-computer-service providers such as Facebook without regard to whether those service providers choose to self-police third-party content. Section 230(c)(2), in contrast, creates additional immunities which are triggered only when an interactive-computer-service provider engages in "action[s] voluntarily taken in good faith to restrict access" to content the service provider deems objectionable. 47

27

U.S.C. § 230(c)(2). As the Ninth Circuit has recognized, *see Barnes*, 570 F.3d at 1105, by including such self-policing language in (c)(2), but omitting it from (c)(1), Congress expressed an intent to confer (c)(1) immunity on all interactive-computer-service providers, irrespective of whether a provider chooses to engage in self-policing activities.

Ignoring that textual distinction, Mr. Klayman instead argues that the title of § 230(c)—"Protection [] for 'Good Samaritan' blocking and screening of offensive material"—"unequivocally limits its application" to those service providers that engage in self-policing activities. Br. of Appellant at 18. But as the Supreme Court has explained in rejecting similar attempts to rely on section titles to change statutory meaning, "the heading of a section cannot limit the plain meaning of the text" or "undo or limit that which the text makes plain," and is instead useful "only when [it] shed[s] light on some ambiguous word or phrase." *Bhd. of R.R. Trainmen v. Balt. & Ohio R.R. Co.*, 331 U.S. 519, 529 (1947).

The two Courts of Appeals' decisions on which Mr. Klayman relies, moreover, do not support creating an implied exception to CDA immunity. *See* Br. of Appellant at 17–19. *First*, the Ninth Circuit in

28

*Barnes* expressly *rejected* the exact same purpose-based argument that Mr. Klayman presses here, holding instead that § 230(c)(1)'s grant of immunity extends even to those service providers that do not self-regulate. *See* 570 F.3d at 1105. *Second*, the Seventh Circuit in *Doe v. GTE Corp.*, 347 F.3d 655 (7th Cir. 2003), in fact declined to decide whether such an implied exception exists, while simultaneously noting that "four circuits" had refused to embrace such an exception and that "[n]o appellate decision is to the contrary," *id.* at 659–60.

### D.     The District Court Did Not Err By Determining CDA Immunity At The Pleading Stage

There is also no merit to Mr. Klayman's suggestion that it was somehow inappropriate for the district court to resolve Facebook's CDA argument at the motion-to-dismiss stage. *See* Br. of Appellant at 37-39. As the Fourth Circuit has explained, courts "aim to resolve the question of § 230 immunity at the earliest possible stage of the case because that immunity protects websites not only from ultimate liability, but also from having to fight costly and protracted legal battles." *Nemet*, 591 F.3d at 255 (internal quotation marks omitted). For that reason, lower courts both within and outside of this Circuit routinely grant motions to dismiss on CDA-immunity grounds. *See, e.g.*, *Parisi*, 774 F. Supp. 2d at

29

316 (granting motion to dismiss on grounds of CDA immunity); *Goddard*, 640 F. Supp. 2d at 1196 (same); *Miles v. Raycom Media, Inc.*, No. 11:09CV713, 2010 WL 3419438, at *3 (S.D. Miss. Aug. 26, 2010) (same); *Doe v. MySpace, Inc.*, 629 F. Supp. 2d 663, 665 (E.D. Tex. 2009) (same); *Global Royalties, Ltd. v. Xcentric Ventures, LLC*, 544 F. Supp. 2d 929, 932–33 (D. Ariz. 2008) (same); *Dimeo v. Max*, 433 F. Supp. 2d 523, 533 (E.D. Pa. 2006) (same).

### E.   This Court Should Reject Mr. Klayman's Attempt To Inject New Facts Into The Record On Appeal.

Finally, this Court should decline Mr. Klayman's invitation to deviate from its appellate role and consider facts never introduced before the district court. "Appellate courts do not ordinarily consider evidence not contained in the record developed at trial." *Colbert v. Potter*, 471 F.3d 158, 165 (D.C. Cir. 2006). Disregarding this longstanding principle, Mr. Klayman has injected facts and evidence in his opening brief in this Court that were not in his complaint and were not presented to the court below. *See* Br. of Appellant at 9–12 & 12 n.1 (reciting statements by the Vice President of Facebook, Marne Levine, which were made on May 28, 2013—over *two years after* Mr. Klayman filed his complaint); *id.* at 11 (discussing Facebook pages that included

30

comments about the 2013 George Zimmerman trial); *id.* at 33 (citing statistics from the Federal Bureau of Investigation about anti-Jewish bias). These facts were not before the district court and could not have been considered in response to the motion to dismiss in any event because they appear nowhere in the complaint. They therefore cannot be considered by this court on appeal.[5]

## II.  Notwithstanding § 230 Of The CDA, Appellant's Tort Claims Fail As A Matter Of Law

Because § 230 of the CDA so plainly requires affirmance, there is no need for this Court to consider the merits of Mr. Klayman's underlying claims. *See id.* at 28–37. But even if the CDA did not apply, this Court should nevertheless affirm the district court's dismissal on alternative grounds because Mr. Klayman's far-fetched claims of assault and negligence are fatally flawed.[6]

---

[5] In contrast, the SRR can properly be considered by this Court on appeal, both because Facebook presented the SRR to the district court below and because the SRR is necessarily incorporated into the allegations in the complaint. *See, e.g.*, *Chase v. District of Columbia*, 723 F. Supp. 2d 130, 133 (D.D.C. 2010); *Hinton v. Corr. Corp. of Am.*, 624 F. Supp. 2d 45, 46–47 (D.D.C. 2009).

[6] Facebook continues to believe that California law should control the adjudication of Mr. Klayman's tort claims, in light of the selection-
(Continued…)

### A.    The Assault Claim Fails As A Matter Of Law

In count one of his complaint, Mr. Klayman alleged that Facebook was liable for civil assault. *See* Compl. ¶¶ 14–17 (J.A. at ___). That claim fails for three independent reasons. *First*, the complaint contains no plausible allegation that Facebook acted in concert with the unnamed speakers who created the Third Intifada Page. Concerted-action liability attaches only when a defendant acts "pursuant to a common design" with, or gives "substantial assistance or encouragement" to, a tortfeasor. Restatement (Second) of Torts § 876 (1979); *see Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983); *Sindell v. Abbott Labs.*, 607 P.2d 924, 932 (Cal. 1980). The complaint, however, contains no allegations that Facebook wrote, sponsored, or in any way assisted the creators of the Third Intifada Page, or that Facebook even knew that the creators of the Third Intifada Page intended to make the alleged threatening statements. And any alleged delay in removing the Third Intifada Page can hardly be deemed the

---

of-law provision included in the Statement of Rights to which Mr. Klayman agreed. *See* Motion to Dismiss, Ex. A (J.A. at ___). Nonetheless, the district court correctly determined that "the elements of each cause of action are identical under both California state law and the law of the District of Columbia." Dist. Ct. Op. at 8 (J.A. at ___).

type of "*substantial* assistance or encouragement" necessary to create liability for civil assault. *See* Restatement (Second) of Torts § 876(b) (1975) (emphasis added).

*Second*, it has long been the rule that mere words, unaccompanied by any threatening overt action on the part of the speaker, cannot amount to an assault. *See Plotnik v. Meihaus*, 208 Cal. App. 4th 1590, 1604 (Cal. Ct. App. 2012); *Saunders v. Nemati*, 580 A.2d 660, 664 (D.C. 1990). That well-established rule dooms Mr. Klayman's assault claim here, because he nowhere alleged that the statements on the Third Intifada Page were accompanied by any overt act on the part of the unnamed speakers demonstrating an intent to immediately carry the threat into execution. And, contrary to Mr. Klayman's assertions, *see* Br. of Appellant at 29, the alleged failure of Facebook to remove the page in a timely manner cannot be understood as an intent to carry out any threats made on the page, *see* Restatement (Second) of Torts § 31 cmt. a (1965); *Marconi v. Officer One*, No. 05-1978, 2006 WL 2827862, at *8 (N.D. Cal. Oct. 3, 2006).

*Third,* Mr. Klayman failed to allege any facts to support his assertion that he was placed in apprehension of *imminent* injury—a

necessary element of the tort of assault. *See, e.g.*, Restatement (Second) of Torts § 29(1) (1965) ("To make [an] actor liable for an assault he must put the other in apprehension of an *imminent* contact." (emphasis added)). The statements on which Mr. Klayman relies for his assault claim allegedly targeted a diffuse group of millions of people and allegedly threatened bodily harm commencing *six weeks* after he filed his initial complaint in this case. *See* Compl. ¶ 12 (J.A. at __) (quoting the Third Intifada Page as saying that "the attacks on Jews and others will commence on or about May 15, 2011"). An alleged threat to cause bodily harm at a point in time six weeks in the future to a diffuse group of people who reside around the world lacks the immediacy necessary to constitute assault.

## B. Mr. Klayman's Claim For Negligence Fails As A Matter Of Law

Mr. Klayman's claim for negligence fails as a matter of law for two independent reasons. *First*, Facebook had no duty to protect Mr. Klayman from the threatening comments of other users. *See Delgado v. Trax Bar & Grill*, 113 P.3d 1159, 1164–65 (Cal. 2005); *see also McKethean v. Wash. Metro. Area Transit Auth.*, 588 A.2d 708, 712, 717 (D.C. 1991). Indeed, Facebook *expressly disclaimed* any such duty in

34

the SRR.  *See* Motion to Dismiss, Ex. A, § 15.3 (J.A. at __) ("WE DO NOT GUARANTEE THAT FACEBOOK WILL BE SAFE OR SECURE." (emphasis in original)); *id.* ("FACEBOOK IS NOT RESPONSIBLE FOR THE ACTIONS, CONTENT, INFORMATION, OR DATA OF THIRD PARTIES." (emphasis in original)).  For this reason, other courts have rejected similar negligence claims against Facebook.  *See, e.g.*, *Young*, No. 5:10-cv-03579, 2010 WL 4269304, at *5 (dismissing negligence claim against Facebook because the SSR disclaimed any duty to protect users from third-party content and common law did not impose such a duty).

*Second*, Mr. Klayman has not alleged any actual injury that he suffered as a result of the existence of the Third Intifada Page, his viewing of the Page, or the alleged delay in removal of the Page. "[A]ppreciable, nonspeculative, present injury is an essential element of a tort cause of action." *Aas v. Superior Court*, 12 P.3d 1125 (Cal. 2000), *superseded by statute on other grounds as stated in Rosen v. State Farm Gen. Ins. Co.*, 70 P.3d 351, 357 (Cal. 2003); *see also Randolph v. ING Life Ins. & Annuity Co.*, 973 A.2d 702, 708 (D.C. 2009).  Mr. Klayman's complaint, however, included only a single conclusory allegation of

damages: "Plaintiff was thereby damaged." Compl. ¶ 20 (J.A. at __). That bare allegation is insufficient to create even a plausible inference that Mr. Klayman suffered an appreciable injury as a result of Facebook's actions.

In his opening brief in this Court, Mr. Klayman argues that he has suffered "severe emotional distress" and "incurred substantial costs" to "substantially alter his life in order to insure his safety and that of his family and his associates." Appellant Br. at 36. None of these allegations, however, were included in his complaint and none provide any detail about his alleged emotional distress or costs that he incurred. Simply put, Mr. Klayman's conclusory allegations of injury are too little, too late.

## CONCLUSION

For the foregoing reasons, this Court should affirm the district court's decision dismissing Mr. Klayman's complaint as a matter of law.

September 25, 2013                    Respectfully submitted,

                                     /s/ Craig S. Primis, P.C.

36

Craig S. Primis, P.C.
K. Winn Allen
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, DC   20005
(202) 879-5000

*Counsel for Appellees*

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7), I hereby certify that this brief contains 7,485 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and D.C. Cir. R. 32(a)(1), on the basis of a count made by the word processing system used to prepare the brief.

/s/ Craig S. Primis, P.C.

Craig S. Primis. P.C.

38

## CERTIFICATE OF SERVICE

I hereby certify that on this day, September 25, 2013, I filed the above document using the ECF system, which will automatically generate and send service to all registered attorneys participating in this case.

/s/ Craig S. Primis, P.C.
Craig S. Primis. P.C.

39

# ADDENDUM OF STATUTES AND REGULATIONS

## 47 U.S.C. § 230

(a) Findings

The Congress finds the following:

> (1) The rapidly developing array of Internet and other interactive computer services available to individual Americans represent an extraordinary advance in the availability of educational and informational resources to our citizens.

> (2) These services offer users a great degree of control over the information that they receive, as well as the potential for even greater control in the future as technology develops.

> (3) The Internet and other interactive computer services offer a forum for a true diversity of political discourse, unique opportunities for cultural development, and myriad avenues for intellectual activity.

> (4) The Internet and other interactive computer services have flourished, to the benefit of all Americans, with a minimum of government regulation.

> (5) Increasingly Americans are relying on interactive media for a variety of political, educational, cultural, and entertainment services.

(b) Policy

It is the policy of the United States--

> (1) to promote the continued development of the Internet and other interactive computer services and other interactive media;

A1

(2) to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation;

(3) to encourage the development of technologies which maximize user control over what information is received by individuals, families, and schools who use the Internet and other interactive computer services;

(4) to remove disincentives for the development and utilization of blocking and filtering technologies that empower parents to restrict their children's access to objectionable or inappropriate online material; and

(5) to ensure vigorous enforcement of Federal criminal laws to deter and punish trafficking in obscenity, stalking, and harassment by means of computer.

(c) Protection for "good samaritan" blocking and screening of offensive material

(1) Treatment of publisher or speaker

No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider.

(2) Civil liability

No provider or user of an interactive computer service shall be held liable on account of--

(A) any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected; or

A2

(B) any action taken to enable or make available to information content providers or others the technical means to restrict access to material described in paragraph (1).[7]

(d) Obligations of interactive computer service

A provider of interactive computer service shall, at the time of entering an agreement with a customer for the provision of interactive computer service and in a manner deemed appropriate by the provider, notify such customer that parental control protections (such as computer hardware, software, or filtering services) are commercially available that may assist the customer in limiting access to material that is harmful to minors. Such notice shall identify, or provide the customer with access to information identifying, current providers of such protections.

(e) Effect on other laws

(1) No effect on criminal law

Nothing in this section shall be construed to impair the enforcement of section 223 or 231 of this title, chapter 71 (relating to obscenity) or 110 (relating to sexual exploitation of children) of Title 18, or any other Federal criminal statute.

(2) No effect on intellectual property law

Nothing in this section shall be construed to limit or expand any law pertaining to intellectual property.

(3) State law

---

[7] So in original.  Probably should be "subparagraph (A)."

A3

Nothing in this section shall be construed to prevent any State from enforcing any State law that is consistent with this section. No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section.

(4) No effect on Communications Privacy law

Nothing in this section shall be construed to limit the application of the Electronic Communications Privacy Act of 1986 or any of the amendments made by such Act, or any similar State law.


(f) Definitions

As used in this section:

(1) Internet

The term "Internet" means the international computer network of both Federal and non-Federal interoperable packet switched data networks.

(2) Interactive computer service

The term "interactive computer service" means any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by libraries or educational institutions.

(3) Information content provider

The term "information content provider" means any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service.

A4

(4) Access software provider

The term "access software provider" means a provider of software (including client or server software), or enabling tools that do any one or more of the following:

**(A)** filter, screen, allow, or disallow content;

**(B)** pick, choose, analyze, or digest content; or

**(C)** transmit, receive, display, forward, cache, search, subset, organize, reorganize, or translate content.