**ORAL ARGUMENT NOT YET SCHEDULED**

CASE NO. 13-7017

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

LARRY KLAYMAN
Plaintiff-Appellant,

v.

MARK ZUCKERBERG and FACEBOOK, INC.
Defendants-Appellees.

---

APPEAL FROM AN ORDER
OF THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FINAL BRIEF OF PLAINTIFF-APPELLANT LARRY KLAYMAN FOR
REVERSAL OF THE DISTRICT COURT'S ORDER AND REQUEST FOR
ORAL ARGUMENT

---

Larry Klayman, Esq.
KLAYMAN LAW FIRM
2020 Pennsylvania Ave. NW, Suite 345
Washington, DC 20006
Tel: (310) 595-0800
Email: leklayman@gmail.com

Plaintiff-Appellant Pro Se

## <u>CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES</u>

Plaintiff-Appellant Larry Klayman hereby certifies pursuant to Circuit Rule 28(a)(1) that:

**A. Parties and Amici**

The parties that appeared in the district court are Plaintiff Larry Klayman and Defendants Mark Zuckerbeg amd Facebook, Inc.

**B. Rulings Under Review**

The ruling under review is the December 28, 2012 Order and Memorandum Opinion of the District Court (Walton, J.), in *Klayman v. Zuckerberg,* D.D.C. No. 11-874.

**C. Related Cases**

Appellant is not aware of any related cases before this Court or currently pending.

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES..............i

TABLE OF AUTHORITIES.....................................................................iii

GLOSSARY....................................................................................vi

JURISDICTIONAL STATEMENT.......................................................1

ISSUES PRESENTED.......................................................................1

STATEMENT OF THE CASE..............................................................3

STATEMENT OF FACTS...................................................................4

STANDARD OF REVIEW.................................................................14

SUMMARY OF ARGUMENT............................................................14

ARGUMENT.................................................................................16

    I.  THE COMMUNICATION DECENCY ACT DOES NOT BAR
       APPELLANT'S CLAIMS..........................................................16

    II. THE DISTRICT COURT ERRED IN GRANTING APPELLEES'
       MOTION TO DISMISS GIVEN APPELLANT'S MERITORIOUS
       CLAIMS FOR ASSAULT AND NEGLIGENCE.......................................28

    III.THE DISTRICT COURT ERRED IN GRANTING APPELLEES'
       MOTION TO DISMISS UNDER FEDERAL RULE OF CIVIL
       PROCEDURE 12(b)(6)...........................................................38

CONCLUSION..............................................................................39

CERTIFICATE OF COMPLIANCE....................................................42

CERTIFICATE OF SERVICE............................................................43

# TABLE OF AUTHORITIES

*800-JR Cigar, Inc. v. GoTo, Inc.,*
437 F.Supp.2d 273 (D.N.J. 2006)..............................................................20

*Ashcroft v. Iqbal,*
556 U.S. 662, 678 (2009) .........................................................................37

*\*Barnes v. Yahoo! Inc.,*
570 F. 3d 1096, 1099-1100 (9th Cir. 2009) ......................................17, 22

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544, 555-57 (2002) ...................................................................37

*Blumenthal v. Drudge,*
992 F. Supp. 44, 49(D.D.C. 1998) ...........................................................20

*Caldwell v. Bechtel,*
631 F.2d 989, 997 (D.C. 1980) ................................................................35

*Carafano v. Metrosplash.com, Inc.,*
339 F. 3d 1119, 1122 (9th Cir. 2003) ......................................................17

*Carter v. Commonwealth of Virginia,*
606 S.E.2d, 839, 841 (2005) ..............................................................29,30

*Chavers v. Gatke.,*
132 Cal. Rptr. 2d 198 (Cal. App. 2d Dist. 1961)......................................33

*\*Chicago Lawyers' Committee for Civil Rights under the Law v. Craiglist,*
461 F. Supp. 2d 681, 696 (N.D. Ill. 2006)...............................17,18, 22,23

*Clark v. Commonwealth,*
54 Va. App. 120, 129 (Va.Ct.App.2009) .................................................29

\* Authorities chiefly relied upon are marked with asterisks.

*Doe v. GTE Corp.*,
347 F.3d 655, 660 (7th Cir.2003)..........................................................17

*District of Columbia v. Zuckerberg,*
880 A. 2d 278, 281 (D.C. 1981) ............................................................36

*Etheredge v. Dist. Of Columbia*,
635 A.2d 908, 916 (D.C. 1993) ............................................................28

*Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*,
521 F.3d 1157, 1170-71 (9th Cir. 2008) ...............................................22

*Hedgepeth v. Whitman Walker Clinic,*
22 A.3d 789, 793 (D.C. 2011) ..............................................................35

*Hoegn v. United States,*
217 F.Supp.2d 39, 45 (D.D.C. 2002) ....................................................35

*Lipnick v. United States,*
717 F.Supp. 902, 904 (D.D.C. 1989) ....................................................35

*McCalden v. California Library Ass'n,*
995 F. 2d 1214, 1219 (9th Cir.1990) .....................................................38

*Outdoor Media Group, Inc. v. City of Beaumont,*
 506 F.3d 895, 899-900 (9th Cir. 2007) ................................................38

*Schuler v. United States,*
617 F.2d 605, 608 (D.C. Cir. 1979) ......................................................38

*Settles v. Redstone Dev. Corp.,*
797 A.2d 692, 695 (D.C. 2002) ............................................................35

*\*Swift v. Zynga Game Network Inc.,*
WL 4569889, 4 (N.D. Cal. Nov. 3, 2010).........................................25,38

*Thing v. LaChusa,*
48 Cal.3d 644, 649 (Cal. 1989)..................................................................28

*United States v. Cook*,
594 F.3d 883, 886 (D.C. Cir. 2010).........................................................14

*Westinghouse Electric Corp. v. Nutt*,
407 A.2d. 606, 609 (D.C. 1979) ...............................................................35

*Woodruff v. DiMario*,
197 F.R.D. 191, 193 (D.D.C. 2000) .........................................................37

## STATUTES AND RULES

28 U.S.C. §1291.........................................................................................1

28 U.S.C. §1367.........................................................................................1

28 U.S.C. §2107.........................................................................................1

47 U.S.C. §230.........................................................................1,16,18,20,22

Federal Rules of Appellate Procedure 4(a)(1)(A) ....................................1

Federal Rules of Civil Procedure 12(b) ......................................15,37,38

Federal Rules of Civil Procedure 56 ..........................................17,18,19,21

# **GLOSSARY**

"CDA" stands for Communication Decency Act, 47 U.S.C. §230

## JURISDICTIONAL STATEMENT

The U.S. District Court for the District of Columbia ("District Court") had jurisdiction over this case pursuant to 28 U.S.C. §1332 because there is complete diversity of citizenship among the parties and the amount in controversy exceeds $75,000 and the District Court had supplemental jurisdiction over Appellant's common law claims under 28 U.S.C. §1367. This Court has jurisdiction over the appeal pursuant to 28 U.S.C. §1291.

The notice of appeal was timely filed pursuant to 28 U.S.C. §2107 and Federal Rules of Appellate Procedure 4(a)(1)(A) on January 25, 2013 from an order of the District Court dated December 28, 2012. The appeal is from a final order that disposed of all of Plaintiff-Appellant's claims.

## ISSUES PRESENTED FOR REVIEW

1. Whether the Communications Decency Act, 47 U.S.C. §230, immunizes all internet services providers from liability regardless Congress' intent and public policy concerns?

2. Whether Appellee Facebook qualifies as an "internet service provider" as defined in the Communications Decency Act?

3. Whether Appellees are "interactive computer service" under the Communications Decency Act when Appellees have oversight and control the content posted on the Facebook webpage?

4. Whether Appellee Facebook is a publisher within the meaning of the Communications Decency Act by posting threatening comments on its website?

5. Whether Appellees were acting as "information content providers," as defined in the Communications Decency Act, even though another "information content provider" created the threatening remarks that were published on Appellees' website?

6. Whether Appellees publication of the Palestinian Third Intifada's threats to kill all Jews on its website, in addition to Appellees' subsequent acts that demonstrate that Appellees encouraged and participated in such tortious conduct, constitutes assault against Appellant?

7. Whether Appellees owed a duty to Appellant, a Facebook subscriber, and whether Appellees breached that duty, under a cause of action for negligence?

## STATEMENT OF CASE

On March 31, 2011, Appellant filed the Complaint in the Superior Court of the District of Columbia, Civil Division, asserting claims for assault and negligence against Appellees. See Compl. ¶14-20; (JA 12-14). The action arose from the harm caused by a page that was posted on Appellees' website, entitled "Third Palestinian Intifada," which contained threatening, inciting, and provoking messages and advocated violence against Jews.

On May 10, 2011, Appellees filed a Notice of Removal seeking to remove the action from the Superior Court of the District of Columbia, Civil Division, to the U.S. District Court for the District of Columbia. The case was subsequently removed to federal court.

On July 21, 2011, in response to a Joint Stipulation filed by the parties, the District Court provided that Appellant shall file an amended complaint. See Min. Order, dated July21, 2011. Subsequently, on August 22, 2011, Appellant filed a Motion for Extent of Time to Amend Complaint. See Mot. For Extension of Time to Amend Compl. On August 24, 2011, the District Court denied Appellant's request for an extension of time to amend the complaint. See Min. Order, dated August 24, 2011.

On April 13, 2012, Appellees filed both a Motion to Dismiss Amended Complaint and a Motion to Transfer Case. Apparently, in their Motion to Dismiss,

Appellees sought immunity from their unlawful conduct by hiding behind the Communications Decency Act. However, it inconceivable the Communications Decency Act is a vast limitless shield of immunity, particularly as the act itself explicitly draws out limitations as to applicability. Despite Appellees' attempt to hide behind the Communications Decency Act, they fail to candidly bring to the Court's attention that the immunity provided was not intended to be used by internet service providers who refuse and repeatedly fail to take any action in controlling the content posted on their webpage, as is the issue in the instant case. On May 2, 2012, Appellant filed his Response in Opposition to Appellees' Motion to Transfer Case and his Response in Opposition to Appellees' Motion to Dismiss.

On December 28, 2012, the Honorable Judge Reggie B. Walton issued a Memorandum Opinion and Order granting Appellees' Motion to Dismiss. On January 25, 2013, Appellant filed his notice of appeal to the U.S. Court of Appeals for the District of Columbia Circuit ("D.C. Circuit").

## STATEMENT OF THE FACTS

Appellees are unjustifiably relying on an inconceivable notion that the Communications Decency Act ("CDA") provides them with absolute immunity from liability when Appellees failed to remove a page posted on its website even though they were fully aware of the page and the contents of the page, which advocated for a violent, hateful, and despicable attacks on Jews and contained

threatening and menacing message against Jews.   Despite receiving numerous

request, including a letter from the Public Diplomacy Minister of Israel and being

fully aware of the significant harm that would inherently result, particularly given

the number of supporters of the page, Appellees refused to remove the inciting

page, which called for an attack against Jews, and even supported, encouraged, and

participated in promoting this violent conduct, by not only allowing the page to

remain on the website but also allowing other similar pages advocating similar

message to be posted on their webpage.  Compl. ¶7;(JA 9).

As a result, Appellant, an American citizen of Jewish Origin, filed a

complaint seeking injunctive relief as well as enjoining Appellees from allowing

postings of websites advocating violent, hateful, and threatening messages towards

Jews and others who support Israel and its right to exist. Compl. at pp. 7;(JA 14).

Additionally, Appellant seeks compensatory and punitive damages as a result of

Appellees' conduct.

Appellees Mark Zuckerberg and Facebook, Inc. (collectively "Appellees")

operate the website, www.facebook.com ("Facebook"), which is a "social

networking" website. Memo. Opinion of December 28, 2012 ("Memo. Opinion")

at 2; (JA 35). Facebook allows users to share contents with others, including

articles, news, and opinions about world events. Memo. Opinion at 2; (JA 35).

Users can also view content shared by other Facebook users on one or more of the

hundreds of millions of Facebook Pages. Memo. Opinion at 2; (JA 35). In fact,

viewership of the website is growing fast and exponentially in many parts of the

world, especially in the Middle East where there is an ongoing Islamic revolution

and, more significantly, efforts by opposition groups to overthrow governments

and to establish a Palestinian state on the West Bank. Compl. ¶4;(JA 8).

(Unfortunately, Palestinians have threatened the destruction of Israel and the

Jewish people if they do not get this state on the West Bank). Compl. ¶4; (JA 8).

Facebook also maintains wide viewership in the United States and, in fact, is

widely viewed and read in the District of Columbia ("D.C") by many Facebook

users, which include radical Palestinians and other such Muslim with anti-Semitic

interests who reside in D.C. and the Metropolitan area. Compl. ¶5; (JA 9).

Appellant is a highly visible, well-known lawyer, advocate, writer, television

and radio commentator, and public figure, who is also a renowned expert on

terrorism and the Middle East. Compl. ¶12; (JA 11). Appellant is also the

Chairman and General Counsel of Freedom Watch, Inc., an organization that

conducts business in D.C. Compl. ¶2; (JA 8). Moreover, Appellant is publicly

active in matters concerning the security of Israel and all people, including but not

limited to Jews, Christians, and Muslims who believe in freedom, and the rights of

persons to not be discriminated against, to live in peace, to worship as they wish as

6

long as they do not cause harm to others, and the rights of man not to be harmed in any way on the basis of national and religious origins. Compl. ¶11; (JA 10).

Furthermore, Appellant, an American citizen of Jewish Origin, is also a civil and individual rights activist and is widely known throughout the Muslim/Arabic world for his support of Israel and his strong opposition to radical Islam. Compl. ¶¶ 4, 11; (JA 10). In addition, Appellant has also publicly taken a firm stance in opposition to the formation of a Palestinian state on the West Bank. To further his advocacy and activism, Appellant has traveled to Israel, where he has met with Israeli government officials including the Office of the Prime Minister's and the Ministry of Foreign Affairs, and has promoted his values, ideologies, and, more significantly his principles of ending the mindless, unprovoked attacks by Muslims against Jews.

Appellant maintains a Facebook account, titled "Larry Klayman," and while using it, Appellant encountered a Facebook page titled "Third Palestinian Intifada" ("Third Intifada Page"). Compl. ¶¶ 6, 7; (JA 9-10). An Intifada is commonly described as a violent revolt conducted by Muslims against non-Muslims and particularly against Jews. Compl. ¶9; (JA 10). Thus, the Third Intifada Page, and similar pages posted on Facebook, openly advocated a violent revolt, (an "Intifada") against persons of Jewish origin, encouraging and inciting the violent attack of and the death of Jews. Compl. ¶7; (JA 9-10).

Specifically, the Third Intifada Page called for an uprising beginning on May 15, 2011, after Muslim prayers were completed, and further threatened that "Judgment Day will be brought upon us only once Muslims have killed all the Jews." Compl. ¶7; (JA 9-10). Unfortunately, the attack against Jews called for by Muslims on the Third Intifada Page became a terrorizing reality and caused many people, including Appellant, to fear an imminent attack at any moment to cause him severe bodily harm or even death. Moreover, the sheer number of viewers, followers, and supporters of the Third Intifada Page significantly intensified this already terrifying actuality. In fact the Third Intifada Page has had over 360,000 participants and has given rise to three similar Facebook pages with over 7,000 subscribers. Compl. ¶7; Memo. Opinion at 2; (JA 9, 35). Indisputably, the substantial viewership and the amount of participants in the Third Intifada Page undeniably advanced and further perpetuated the violent threat posed from the page's abhorrent content.

Notably, as evidence of the detrimental influence of content advocated for such violent attacks on Jews and the brutal, inhumane, and deadly harm that is actually by such content, there have been two previous Intifadas against people of Jewish origin by radical Palestinians. Compl. ¶10; (JA 10). The first occurred between 1987 and 1993, and resulted in the civilian death toll of 164 Jews. Compl. ¶10; (JA 10). The second occurred between 2000 and 2005 and resulted in the

civilian death toll of 1,115 Jews. Compl. ¶10; (JA 10). The threats and terrorist

attacks on Jews have taken place and continue to take place even without regard to

formal Intifadas. Compl. ¶10; (JA 10).

Justifiably, the Third Intifada Page caught the attention of the Public

Diplomacy Minister of Israel, who subsequently wrote a letter to Appellees

requesting that the Third Intifada Page and other similar pages be removed from

Facebook, as these pages featured "wild incitement" with call to kill Jews and talk

of liberating Jerusalem through violence. Compl. ¶7; Memo. Opinion at 2; (JA 9,

35). Appellees, however, refused to remove the page, which is not surprising since

viewership and participation of the website dramatically increased, particularly in

the Middle East, given the controversial nature of the matter. Compl. ¶7; (JA 9). In

fact, Appellees adamantly declined to remove the hateful, inciting, and threatening

page for many days, and eventually removed it "begrudgingly," after the damage

had already been done. Compl. ¶12; (JA 11). After all, not only did viewership of

Appellees' webpage increased but consequently, so did their revenue.

Apparently, this type of careless behavior of failing to remove inappropriate

content from its webpage has become the norm for Appellees, as acknowledged by

Marne Levine ("Levine"), a Facebook Vice President in charge of public policy.

Specifically, in addressing and essentially admitting Appellees' repeated failures

and inadequate actions in responding to inappropriate content posted on its

webpage, Levine made the following statement:

> "In some cases, content is not being removed as quickly as we
> want. In other cases, contents that should be removed has not
> been or has been evaluated using outdated criteria…the
> guidelines used by these systems have failed to capture all the
> content that violates our standards."
> (https://www.facebook.com/notes/facebook-safety/controversial-
> harmful-and-hateful-speech-on-facebook/574430655911054).

Levine further stated the following:

> "We [Facebook] prohibit content deemed to be directly
> harmful…We define harmful content as anything organizing real
> world violence, theft, or property destruction, or that directly
> inflicts emotional distress on a specific private individual…"
> (https://www.facebook.com/notes/facebook-safety/controversial-
> harmful-and-hateful-speech-on-facebook/574430655911054).

Interestingly, Appellees somehow still manage to fail capturing content that

violates their standards even when Appellees are given explicit notice of the

inappropriate content and are repeatedly and relentlessly asked to remove the

improper content. Through these detailed, comprehensive, and painstaking notices

and countless requests for Appellees to remove the Third Intifada Page, it could

not have possibly been any more clearer to Appellees of the requisite actions

needed to be taken and yet they still managed to fail in completing the simple and

effortless task of merely removing the violent and dangerous Third Intifada Page.

10

In fact, a recent publication discussed yet another incident of Facebook's indifferent and unresponsive behavior. Specifically, it was revealed that Facebook recently received a request asking the company to review a page posted on its website dubbed "RIOT for Trayvon," which advocated an attack on George Zimmerman (a Florida resident who was recently acquitted for the death of a teenager, Trayvon martin) and contained a picture of an unconscious person on the floor. See "Facebook Won't Remove 'Kill Zimmerman' Page, Delays Blocking 'Riot for Trayvon Martin,'" by Christian Toto, dated July 3, 2013 (http://www.breitbart.com/Big-Journalism/2013/07/03/facebook-wont-remove-riot-trayvon-page). However, Facebook initially refused to remove the page, claiming it "doesn't violate our community standard on credible threat of violence." *Id*. Facebook later removed the page from its website, but allowed another page titled "Kill Zimmerman" to remain on Facebook. *Id.*

Moreover, in addition to the above statements, Levine also refers to a list of prohibited categories of content that can be found on Facebook's "Community Standards" page, which addresses, in part, violence and threats. In regard the violence and threats found on posted pages, Appellees undertake an explicit promise and assumed obligation to remove such content from Appellees' webpage as provided on Facebook's "Community Standard" page. Specifically, the Community Standards provides the following:

11

"Safety is Facebook's to priority. We remove content and may escalate to law enforcement when we perceive a genuine risk of physical harm, or a direct threat to public safety. You may not credibly threaten others, or organize acts of real-world violence. Organizations with a record of terrorist or violent criminal activity are not allowed to maintain a presence on our site. We also prohibit promoting, planning, or celebrating any of your actions if they have, or could, result in financial harm to others..." (https://www.facebook.com/communitystandards).[1]

Ironically, Appellees apparently have forgotten about their self-implemented "Community Standards," and "Statement of Rights," as Appellees have failed to remove such violent and threatening content as promised but have, instead, remarkably ignored the perceived genuine risk of physical harm caused by Appellees' own conduct and their careless and unjustifiable inaction.

Specifically, Appellees have undoubtedly disregarded their responsibilities and have endangered the safety and the life of Appellant and others by allowing the violent and threatening Third Intifada Page to remain posted for a lengthy period of time, despite repeated demands for its removal. In fact, Appellees reluctantly removed the page only after it had already been widely viewed on the

---

[1] Facebook's Statement of Rights prohibits "hate speech." Marne Levine's statement addresses this portion of Facebook's Statement of Rights by stating the following: "…We define [hate speech] to mean direct and serious attacks on any protected category of people based on their race, ethnicity, national origin, religion, sex, gender, sexual orientation, disability or disease. We work hard to remove hate speech quickly…" (https://www.facebook.com/notes/facebook-safety/controversial-harmful-and-hateful-speech-on-facebook/574430655911054).

internet and was undoubtedly read by Palestinians and other radical Muslims, many of whom reside in D.C.

Accordingly, Appellees' inaction, as described above, encouraged and promoted viewers to severely harm or kill Appellant, especially given Appellant's public opposition to radical Islam. Compl. ¶11; (JA 11). By allowing the Third Intifada Page to remain posted, Appellees have not only disregarded their responsibilities but have also acted in concert in the on-going threats and assaults on Appellant and other Jews, consequently endangering the safety and the lives of Appellant and others. Compl. ¶12;(JA 11).

As such, Appellant is seeking relief from Appellees' intentional, reckless and negligent conduct in allowing and in fact furthering the posting of webpages that advocated the killing of Jewish people to obtain the state on the West Bank, which directly placed Appellant in immediate harm. *Id.* ¶ 4;(JA 8-9). Put simply, Appellant who travels to Israel and works in Washington, D.C., which has a large Arabic and Palestinian population, has a target on his back as a direct result of Appellees' conduct. Thus, the District Court erred in granting Appellees' Motion to Dismiss, and denying Appellant his right to lawfully pursue his claims against Appellees.

## STANDARD OF REVIEW

This appeal raises questions of law, which are reviewed *de novo. United States v. Cook*, 594 F.3d 883, 886 (D.C. Cir. 2010).

## SUMMARY OF ARGUMENT

The District Court erred when it dismissed Appellant's Complaint against Appellees and held that Appellees were immune from liability under the Communications Decency Act ("CDA"). Indeed, the CDA does not provide an absolute and limitless grant of immunity and the District Court's improperly granted Appellees immunity from liability pursuant to the CDA. In fact, it certainly was not intended to immunize Appellees for their careless inactions, failure to self-regulate, and refusal to remove dangerous material posted on their website, despite having notice of its violent and threatening contents. Consequently, the District Court's improper order directly contravenes legislative intent and substantially impedes on significant public policy interests.

Notwithstanding legislative intent and public policy concerns, the District Court improperly held that Appellees satisfied the CDA's requirements for immunity and were thus immune from liability for their tortious conduct. In reaching this conclusion the District Court did not recognize that Appellees are not "interactive computer services," as defined by the CDA, since Appellees are able

14

to review, oversee, and control the content posted on their website. Additionally, Appellant's claims do not derive from Appellees' status or conduct as a publisher or speaker nor do they place Appellees in a "publishers" role. Rather, Appellant's claims arise from Appellees' conduct derived from a special relationship between the parties resulting from a contractual relationship and obligation. Moreover, the District Court improperly concluded that Appellees were not content providers, failing to take into account significant facts that establish Appellee's status as content providers, and thus, are precluded from immunity under the CDA. Given Appellees' elicit and aggressive use of the complained of content, which advocated illegal and violent violent conduct, and Appellees' utilization of such content to boost viewership and increase revenue, Appellees are clearly content providers as established by significant and persuasive case law.

Thus, the District Court erred in determining that Appellees are "interactive computer services," that Appellant's claims derive from Appellees status as a publisher, and that Appellees are not "content providers," thereby mistakenly concluding that the CDA's requirements were satisfied and that Appellees were immune from liability. However, since the requirements for immunity have not been satisfied, as set forth above, it is clear that the District Court erred in providing Appellees' immunity under the CDA and therefore, warrants reversal of the District Court's Order.

15

Lastly, the District Court erred in dismissing Appellant's claims for negligence and assault under Rule 12(b)(6), since Appellant's has established a likelihood of succeeding on the merits of the case and has pled facts sufficient to state a cause of action for which he is entitled to relief.

## **ARGUMENT**

## I. **THE COMMUNICATIONS DECENCY ACT DOES NOT BAR APPELLANT'S CLAIMS**

The Communications Decency Act of 1996 ("CDA") 47 U.S.C. § 230 provides that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). The CDA defines an "interactive computer service" as "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by libraries or educational institutions." 47 U.S.C. § 230(f)(2). An "information content provider" is defined as "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service." 47 U.S.C. § 230(f)(3).

Although the CDA does provide immunity to interactive computer service providers for content created by a third-party user, the immunity is hardly absolute,

16

particularly under these circumstances. The CDA is designed to promote the free

exchange of information and ideas and to encourage *voluntary monitoring* for

offensive or obscene material. *Barnes v. Yahoo!, Inc*., 570 F. 3d 1096, 1099-1100

(9th Cir. 2009) citing *Carafano v. Metrosplash.com, Inc*., 339 F. 3d 1119, 1122

(9th Cir. 2003) (emphasis added). Congress did not intend to provide a broad grant

of immunity for those interactive computer services that do not screen any third-

party content whatsoever. *Craiglist*, 461 F.Supp. 2d at 697, citing *Doe v. GTE

Corp*., 347 F.3d 655, 660 (7th Cir.2003).

 To fall within the immunization granted under the CDA, and thereby bar

Appellant's claims, three requirements must be satisfied: (1) Appellees must be

providers of an interactive computer service; (2) Appellant is seeking to treat

Appellees as publishers or speakers of any information provided; and (3) the

information at issue was published by another information content provider. In

analyzing the above, it is apparent that this case is the quintessential example of an

action that should not be barred by the CDA, particularly in light of public policy

concerns, Congress' intent in enacting the CDA, and the inapplicability of the

CDA pursuant to the above-mentioned requirements.

## A. <u>The Legislative Intent Of The CDA And Public Policy Concerns Support An Exception To Immunity In This Case And Similar Cases.</u>

 In enacting the CDA, Congress sought to promote the free exchange of ideas

while encouraging self-regulation by internet service providers. *Yahoo!, Inc*., 570

17

F. 3d at 1099-1100.  However, it was not Congress' intent to grant "…a vast, limitless immunity…" *Chicago Lawyers' Committee for Civil Rights under the Law v. Craigslist*, 461 F. Supp. 2d 681, 696 (N.D. Ill. 2006). The act itself explicitly draws out limitations as to its applicability, excluding immunity in criminal cases, intellectual property law cases, and cases involving state laws that are consistent with the CDA. Where Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions may be inferred provided there is evidence of a contrary legislative intent. *Craiglist*, 461 F. Supp. 2d at 699.

Moreover, the plain language of the CDA unequivocally limits its application, stating that its protection is "for 'Good Samaritan' blocking and screening of offensive material." 47 U.S.C. §230(c). Through implementing this restriction on immunity under the CDA, Congress ensured that both policies of "remov[ing] disincentives for the development and utilization of blocking and filtering technologies" and "vigorous enforcement of Federal criminal laws" would be served. To allow a contrary approach, by providing immunity to internet service providers in instances of inaction and failure to block or filter dangerous material, would indisputably encourage internet service providers "…to take the do-nothing option and enjoy immunity because precautions are costly." *Yahoo!, Inc*., 570 F. 3d at 1105 citing *GTE Corp*., 347 F. 3d at 660. Thus, in considering Congress' intent, the CDA was clearly not intended to immunize a social network, such as

18

Facebook, from liability, when Appellees repeatedly failed to take any action and consistently refused to engage in any self-regulation. See *Yahoo!, Inc.,* 570 F. 3d at 1105 (The immunity provided by the CDA is not intended to be used by internet service providers who fail to take any action whatsoever).

Specifically, Appellees are attempting to hide behind the CDA as an excuse for its failure to regulate the contents of its pages. Despite having notice of the Third Third Intifada Page, which advocated and incited the killing of Jews while promoting the liberation of Jerusalem through violence and murder, Appellees blatantly ignored the repulsive and highly dangerous content and refused to take any action. Specifically, Appellees refused to remove the inciting and provoking page from their website, and instead carelessly allowed several other similar pages promoting analogous violent ideals to be posted on their website. Compl. ¶ 7;(JA 9).

Thus, in light of Appellees' conduct (or lack of action), it is clear that Congress did not intend to provide Appellees a "free pass" by essentially allowing Appellees to take no action in self-regulation and still allow them to enjoy the protections of the CDA by being shielded from liability. Not only would this be contrary to Congress's intent, but would also establish a dangerous precedent rendering the CDA powerless in recognizing and advancing the important policy goals promoted by the act.

19

**B. The Requirements For Immunity Under The CDA Are Not Satisfied And Thus, Appellant's Claims Are Not Barred.**

To fall within the immunization granted under the CDA, and thereby bar Appellant's claims, three requirements must be satisfied: (1) Appellees must be providers of an interactive computer service; (2) Appellant is seeking to treat Appellees as publishers or speakers of any information provided; and (3) the information at issue was published by another information content provider.

### *(i)    Appellees Are Not Interactive Computer Service Providers*

The CDA defines an "interactive computer service" as "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by libraries or educational institutions." 47 U.S.C. § 230(f)(1). Appellees do not meet this definition.

Unlike America Online ("AOL") and other true "interactive computer services," Facebook does not provide access to any computer system. The difference between an actual "interactive computer service," who the CDA was meant to protect, and a website like Facebook, was best demonstrated in *800-JR Cigar, Inc. v. GoTo, Inc.*, 437 F.Supp.2d 273 (D.N.J. 2006), which explained that websites such as Facebook do not "provide access to the Internet like service providers such as AOL." *Id.*

20

Moreover, the CDA was meant to immunize companies that cannot possibly control the content they are receiving from outside sources. *Blumenthal v. Drudge*, 992 F. Supp. 44, 49(D.D.C. 1998). Facebook is significantly different from companies such as AOL that cannot possibly control the content on their servers for all their customers. *Id.* Unlike AOL, Facebook can control the contents posted on their website and, in fact, invites and encourages others to share content and to post information and materials on its pages.

In fact, Appellees' ability to oversee and control the content posted on their website is evidenced by their own admissions through the statements of Levine, the language contained in Facebook's "Community Standards," and the provisions in the "Statement of Rights." Specifically, the language of the Statement of Rights explicitly states: "We do our best to keep Facebook safe," which expressly notifies users of Facebook that they take action in ensuring the promotion of its safety. Implicit in this disclaimer is Facebook's ability to control the contents posted on their website and to remove any content that is inappropriate or, as in this case, dangerous.

Moreover, the fact that Appellees are merely maintaining a website does not immunize them from liability under the CDA. More specifically, the term "interactive computer services" does not encompass any and all websites simply because it is on the internet. In fact, such a classification would render the

21

"obligations of interactive computer service" superfluous and useless, allowing them to simply ignore their obligations under the CDA.

Thus, the District Court erred in determining that Appellees are interactive computer services, particularly given Appellees to control the contents posted on their website and that merely maintaining a website on the internet does not constitute "interactive computer services." As such, this requirement of the CDA is clearly not satisfied and thus, the District Court improperly held that the CDA was applicable to Appellees.

### (ii)    *The CDA Only Applies To Claims That Involve Publishing As An Element And, Thus Is Inapplicable.*

When examining an Appellant's claims in the context of the CDA, the Court must address whether the alleged conduct "derives from the defendant's status or conduct as a publisher or speaker. If it does, §230(c)(1) precludes liability." *Barnes v. Yahoo!, Inc.,* 570 F.3d 1096, 1102 (9th Cir. 2009). Specifically, §230 provides: "No provider or user of an interactive computer service shall be treated as a publisher or speaker of any information provided by another information content provider." *Craiglist*, 461 F.Supp. 2d at 668, citing 47 U.S.C. §230(c)(1).

In defining "publisher" within the meaning of the CDA, other courts have construed the term as referring to one who "review[s], edit[s], and decid[es], whether to publish or to withdraw from publication third-party content." *Yahoo! Inc.,* 570 F.3d at 1102 (citing *Fair Hous. Council of San Fernando Valley v.*

*Roommates.com*, *LLC*, 521 F.3d 1157, 1170-71 (9th Cir. 2008). In sum, §230 precludes courts from entertaining claims that would place a computer service provider in a publisher's role, particularly when exercising publisher's traditional editorial functions such as deciding whether to publish, withdraw, postpone, or alter content. *Craiglist*, 461 F.Supp. 2d at 668.

In the instant case, the District Court clearly erred by misconstruing Appellant's references to contractual duties and obligations as alleging a breach of contract cause of action. Hence, because, Appellant's "complaint…is devoid of any references to any contractual causes of action," the District Court declined to address Appellant's well supported reasoning establishing Appellees' liability. Thus, the District Court improperly inferred that, simply because Appellant did not assert a breach of contract claim in his Complaint, Appellant seeks to hold Appellees liable as publishers.

Applying the principles above, Appellant's claims do not derive from Appellees' status or conduct as a publisher or speaker but are based on Appellees' breach of its duties arising from the special relationship between the parties as a result of their contractual relationship and contractual obligations.

In fact, Appellees' duty owed to Appellant is evidenced by Appellees' own admissions by the statements of Levine, the language of Facebook's "Community Standards," and the provisions of Facebook's "Statement of Rights."

Facebook has explicitly notified users of Facebook that they take action in ensuring the promotion of its safety, as indicated in the Statement of Rights, which explicitly states, "We do our best to keep Facebook safe…"  Moreover, as previously mentioned, the policy of the CDA is to encourage self-regulation for exactly this purpose. Facebook assurance "to do its best" raises the implication that it would take some action if the need arose. Despite its promise, Facebook failed to take any timely action upon notice of the threatening messages posted on the page. Rather, it allowed the page to remain posted for many days before finally removing the message. Additionally, Facebook merely stood-by as several other similar pages emerged. As such, there was a duty that arose out of the contractual relationship between the parties as indicated by Facebook's Statement of Rights. Thus, the CDA immunity does not bar Appellant's claim since the issue isn't whether Facebook acted as a publisher or speaker, but rather that Facebook failed to take any action whatsoever despite contractual obligations.

Thus, since Appellant's claims derive under a contractual relationship, Appellee is liable under a contracts theory, not from his status or conduct as a publisher or speaker. *Yahoo!, Inc.,* 570 F. 3d at 1107 (holding that Defendant internet service provider's liability under a promissory estoppel theory was not precluded by the CDA. The court reasoned that the internet service provider was liable as a counter-party to a contract, not as a publisher or speaker).

24

### (iii)    *Appellees Are Content Provider And Thus, Are Not Immune From Liability Under The CDA.*

In enacting the CDA, Congress sought to immunize the removal of user-generated content, not the creation of content by interactive computer service providers. *Swift v. Zynga Game Network Inc.* WL 4569889, 4 (N.D. Cal. Nov. 3, 2010, citing *Fair Housing Council of San Fernando Valley v. Roomates.Com, LLC.*, 521 F.3d 1157, 1163 (9th Cir.2008). An internet computer service provider may be found liable if it is responsible, in whole or in part, for creating or developing the content. *Zynga*, WL 4569889 at 5. An interactive computer service provider falls within the exceptions to the CDA and becomes liable if it contributes materially to the alleged illegality of the conduct. *Zynga*, WL 4569889 at 4, citing *Roomates.Com, LLC.*, 521 F.3d at 1166. The court further recognized that a distinction exists between a website that merely provides "neutral tools," which may be utilized by third parties to post unlawful content, and other websites that both elicit the allegedly illegal conduct and make aggressive use of it in conducting business. *Zynga*, WL 4569889 at 4. Appellees' website clearly falls in the latter category as evidenced by their elicit and aggressive use of the unlawful and dangerous content, and their utilization of such content to boost is subscribership and viewership.

According to their "Data Use Policy," Appellees receive information whenever users interact with Facebook.

(https://www.facebook.com/full_data_use_policy). Appellees use the data they collect from Facebook users for a number of purposes, including, most notably, "to measure or understand the effectiveness of ads you and others see," and "to make suggestions to you and other users on Facebook…" *Id*. By utilizing the collected data in this manner, Appellees are able to increase the profitability of advertisements and have even spawned new forms of advertising given of the uniqueness of the data accessible to Appellees.

   As way of example, page owners can increase the visibility of data shared between "friends" on Facebook by paying for "Sponsored Stories," thereby increasing the likelihood that a user will be directed to their page. (See Data Use Policy, supra, "Sponsored Stories"). Far from the implication of being a passive forum for posting data and sharing data with others," Facebook is clearly a data mine that Appellees utilize to direct users to certain content in order to generate billions in revenue.

    As an online social-networking service Facebook's primary objective is to promote content sharing among users by allowing users to share content with other users through various means, including posting a page on Appellees' website. Indisputably, the success and use of Facebook is directly related to the availability of such pages. Thus, it is in Appellees' best interest to maintain and to increase

subscriber use by promoting the creation of various posts, thereby compelling Appellees to make aggressive use of such pages in conducting its business.

Thus, it is clear that Facebook allowed such pages, including the Third Intifada Page, containing violent and threatening messages intended to incite violence against Jews, purely for self-gain. Rather than removing the Third Intifada Page in a timely manner, Facebook instead, willfully and intentionally allowed the page to remain on their website for several days, exposing many to the harm caused by its violent message.

Moreover, as a result of Facebook's continued inaction, Appellees' conduct further perpetuated the creation of other pages containing similar threatening and provoking messages. *Id.* ¶ 7 (See, i.e. "Countdown to the date of the third Palestinian intifada – Display Page, at www.facebook.com/Intifada.15May; Palestinian Intifada 3, at www.facebook.com/Palestine.Intifada.3.third; Third Palestinian Intifada, at www.facebook.com/Third.Palestinian.Intifada2). Clearly, Appellees made aggressive use of the posted pages in conducting business by failing to take any action in this controversial matter, repeatedly refusing to remove the page, and instigating the creation of other similar pages, which consequently increased Facebook's subscribership, viewership and revenue.

Moreover, through the aggressive use of such pages in conducting business, as described above, Appellees actively provided content and thereby implicitly

encouraged the illegal, harmful, and violent conduct. Thus, as provided by the Court in *Zynga*, Appellees' aggressive use of such pages in conducting business renders Appellees to be a content provider subject to liability under the CDA.

## II.   THE DISTRICT COURT ERRED IN GRANTING APPELLEES' MOTION TO DISMISS GIVEN APPELLANT'S MERITORIOUS CLAIMS FOR ASSAULT AND NEGLIGENCE

The District Court erred in granting Appellees' Motion to Dismiss before even considering the merits of Appellant's meritorious claims for assault and negligence. In reaching the merits of the claim, the facts strongly support the allegation that Appellees are liable for assault and negligence.

### A. Governing Law

As indicated in the District Court's Order, given that the action was filed in D.C., the law of D.C. might govern. However, Appellees contend that California law should control. "The choice of law is of no moment, however, because the elements of each cause of action are identical under both California state law and the law of the District of Columbia." Memo. Opinion at 8.

### B. Appellees Are Liable For Assault By Satisfying The Elements Of The Cause Of Action, And Acting In Concert With The On-Going Threats By Engaging In Acts That Encourage Tortuous Conduct And Establish A Common Design.

Assault is defined as "an intentional and unlawful attempt or threat, either by words or by acts, to do physical harm to the victim." *Etheredge v. Dist. Of Columbia*, 635 A.2d 908, 916 (D.C. 1993). See also *Thing v. LaChusa*, 48 Cal.3d

28

644, 649 (Cal. 1989) ("A civil action for assault is based upon an invasion of the right of a person to live without being put in fear of physical harm.").

(i) ***Appellant's Assault Claim Is Meritorious, Given The Intentional And Unlawful Threat Of Physical Harm.***

Under tort law, an overt act may be committed merely with the "intent to place the victim in fear or apprehension of bodily harm" where the act creates such reasonable fear or apprehension in the victim." *Clark v. Commonwealth*, 54 Va. App. 120, 129 (Va.Ct.App.2009) citing *Carter v. Commonwealth of Virginia*, 606 S.E.2d, 839, 841 (2005). Significantly, words may be sufficient to constitute assault, particularly since "…words are never spoken in a vacuum, and they cannot be utterly divorced from past conduct, or from the accompanying circumstances." *Clark*, 54 Va.App. at 129 citing Restatement (Second) of Torts § 31 cmt. d (1965). In light of the above principles, it is clear that the threats perpetuated by Appellees "cannot be utterly divorced from past conduct, or from the accompanying circumstances," and the threatening words are sufficient to constitute assault.

In regard to the requirement of an overt act for a claim for assault, Appellees were aware of the Third Intifada Page and failed to remove the website, despite knowing that its users would be exposed to the threatening messages and such violent and menacing views would potentially gain support, increasing the likelihood of wild incitement to violent and deadly action. Compl. ¶ 7; (JA 9). After all, the Intifada page and the continued republication of it did, in fact, gain

support as evidenced by the number of participants on such pages. Id. ¶ 7; (JA 9).

Thus, Appellees' failure to remove the page after being notified of its violent, life

threatening and unlawful message and continuance of allowing republications of

similar messages constitutes an overt act, putting Appellant in reasonable

apprehension of severe bodily harm and/or death. Compl. ¶ 16; (JA 13).

   For assault, "apprehension of immediate bodily contact" is required.

Restatement (Second) of Torts § 31. Assault does not, however, require the present

ability to inflict harm when a person acts in a manner intended to put the victim in

reasonable fear or apprehension and causes the victim such fear or apprehension.

*Carter*, 606 S.E.2d at 842. In considering the facts and circumstances, it is clear

that Appellant was placed in a position that caused him fear and apprehension of

imminent injury. Specifically, Appellant is an unwavering advocate for the rights

of all people to live in peace, free from discrimination and to worship as they wish,

provided they do no harm to others. As an outspoken critic of radical Islam,

Appellant is widely known throughout the Arab/Muslim world for his support of

Israel, resulting in his being labeled as a "Zionist." Compl. ¶ 11; (JA 10).

   In fact, through the Freedom Watch, Inc. organization that he founded,

Appellant filed suit in the Supreme Court of New York to enjoin the building of a

mosque at Ground Zero. In response to Appellant's complaint in the Ground Zero

case, the Imam of this mosque, Imam Feisal Rauf, decried the lawsuit as "blind

30

bigotry" and characterized Plaintiff and his client as enemies of Islam and Nazis. Compl. ¶ 11, 18; (JA 10,13). Imam Rauf's charge was a clear signal to radical Islamist Palestinians, many of whom reside in Washington D.C. and throughout the United States, to cause severe bodily harm to, or kill, Plaintiff. Compl. ¶ 11; (JA  10-11). His edicts were in effect a "fatwah" against Appellant. *Id.*

Against this backdrop, the Third Intifada Page advocated violent revolt and murder by Muslims against non-Muslims, particularly against and toward Jews. Compl. ¶ ¶ 8, 9; (JA 10).  The page maintained over 360,000 participants. Compl. ¶ 7; (JA 9-10). Moreover, additional pages advocating similar wild incitement to life-threatening violence have emerged, maintaining over 7,000 subscribers. *Id.* ¶ 7; (JA 9-10).

Moreover, Appellant is an American citizen of Jewish origin who has been prominent in the public eye. *Id.* ¶ 11; (JA 10-11). In addition to being a civil and individual rights activist, Appellant is also a well-known lawyer, a writer, as well as a television and radio commentator. *Id.* ¶ 11; (JA 10-11). In these roles, Appellant has traveled to Israel to stand in firm opposition to the formation of a Palestinian state, particularly through the killings of Jewish people. For this, he is highly known throughout the Muslim/Arabic world. Compl. ¶ ¶ 4, 11; (JA 8-9, 10-11). Being such a highly recognizable and influential public figure of Jewish origin who stands in firm opposition to radical Islam, Appellant lives in the line of fire

31

with a target on his back. Compl. ¶ 15; (JA 12-13). Indeed, he has been threatened

by radical Muslims for his advocacy of Israel (see also,

www.freedomwatchusa.org). Appellees' failure to remove the Third Intifada page

as well as allowing similar websites to emerge, has resulted in apprehension of

immediate bodily harm and/or death in Appellant. Appellant's notoriety, in

conjunction with the Facebook pages' advocacy of violence could have motivated

any single member of these pages' more than 360,000 participants to harm

Appellant. *Id*. ¶ 11; (JA 10-11). The general advocacy of violence towards Jewish

people, particularly high profile individuals, is sufficient to create more than

reasonable apprehension and fear of immediate bodily injury and death in

Appellant.

Further supporting the reasonableness of Appellant's apprehension and fear

of immediate bodily injury and/or death is the Israel Security Agency's monthly

summary for March 2011. In fact, the monthly summary clearly shows that

apprehension of bodily harm to Jews such as Appellant was reasonable. In that

month there was "a significant increase in the number of attacks compared to

recent months: 128 attacks as opposed to 61 in February and 83 in January 2011."

(Israel Security Agency, Monthly summary – March 2011,

www.shabak.gov.il/SiteCollectionImages/english/TerrorInfo/reports/march11repor

t-en.pdf, last viewed on May 1, 2012) These attacks left 6 people dead, including

one tourist who was killed in an explosive device attack in Jerusalem. *Id*. And this violence is not geographically restricted: the most recent FBI hate crime statistics show that anti-Jewish bias makes up for sixty seven percent of all religiously motivated hate crimes in the United States. (U.S. Department of Justice - Federal Bureau of Investigation, Hate Crime Statistics, 2010, (November 2011), available at www.fbi.gov/about-us/cjis/ucr/hate-crime/2010/narratives/hate-crime-2010-victims.pdf, last viewed on May 1, 2012)

Thus, in considering the above, Appellant has undoubtedly sufficiently pled facts that properly states a claim for assault, showing that Appellant is entitled to relief.  Thus, the District Court erred in dismissing Appellant's claim for assault.

### (ii)    *Appellees Are Liable For Assault By Encouraging, Supporting, And Participating In The Tortious Conduct.*

In addressing assault, § 876 of Restatement (Second) of Torts, Comment b provides that "advice or encouragement to act operates as a moral support to a tortfeasor and if the act encouraged is known to be tortious it has the same effect upon the liability of the advisor as participation or physical assistance. *Chavers v. Gatke.*, 132 Cal. Rptr. 2d 198, 205 (Cal. App. 2d Dist. 1961), citing to Rest.2d, §876, com.d. Additionally, liability may be imposed when the defendant engages in acts "pursuant to a common design." Rest.2d, §876, com.b.

Appellees, through deliberate inaction, encouraged and in fact participated in the unlawful conduct of a third party user. Specifically, Appellees had notice of the

33

page titled "Third Palestinian Intifada," were notified of the page's advocacy of unlawful violence and terrorism, declined to remove the website for many days, and instead proceeded to allow similar websites to be posted on their website. Compl. ¶ 7; (JA 9-10). Although fully aware of the violent and life-threatening messages being promoted by the Third Palestinian Intifada page, Appellees intentionally declined to remove the page to avoid the risk of losing some of the monetary value represented by the 360,000 plus users supporting the page, or slowing the momentum of Facebook's growth in the Arab/Muslim world. Compl. ¶ 17; (JA 13).[2]

As a result of Appellees' refusal to remove the website and further inaction in preventing similar websites from emerging, Appellees encouraged, supported, and participated in the unlawful conduct of violence and economically benefited from the sensational popularity of the Third Palestinian Intifada page and those like it. *Id.* In addition, such continuous inaction and permissive behavior on the part of Appellees, and thus, encouragement of the unlawful conduct contained in the Third Palestinian Intifada Page, Appellees clearly also engaged in acts pursuant to a common design.

---

[2] At the time that Appellees were made aware of the Third Palestinian Intifada page, the threat of losing users was particularly relevant since Appellees were beginning the process of valuing Facebook in preparation for the issuance of an initial public offering of stock in the company in May 2012. Compl. ¶ 12; (JA 11-12).

**C.** ***Appellees Are Liable For Negligence Given The Duty Owed To Appellant And Damages Suffered By Plaintiff As A Result Of Appellees Breach Of Duty***

In order to prevail on a claim of negligence, the plaintiff "must show: (1) that the defendant owed a duty to the plaintiff; (2) breach of that duty; and (3) injury to the plaintiff that was proximately caused by the breach. *Hedgepeth v. Whitman Walker Clinic*, 22 A.3d 789, 793 (D.C. 2011).

"Whether a duty is owed is a question of law to be determined by the court." *Hoegn v. United States*, 217 F.Supp.2d 39, 45 (D.D.C. 2002) (citing *Settles v. Redstone Dev. Corp.*, 797 A.2d 692, 695 (D.C. 2002). A "duty of care will arise with respect to a condition that poses an 'unreasonably great risk of harm.'" *Lipnick v. United States*, 717 F.Supp. 902, 904 (D.D.C. 1989) (quoting *Westinghouse Electric Corp. v. Nutt*, 407 A.2d. 606, 609 (D.C. 1979). The existence of a duty of care depends on the facts and circumstances of each case. The Restatement (Second) of Torts § 303 defines an act as "negligent if the actor intends it to affect, or realizes or should realize that it is likely to affect, the conduct of another…in such a manner as to create unreasonable risk of harm to the other." Restatement (Second) of Torts §303 (1965).

(i)     ***Duty***

Moreover, a duty of care may also arise when a defendant assumes a contractual duty that "place[s] [the defendant] in the position of assuming a duty to

[a plaintiff] in tort." *Caldwell v. Bechtel*, 631 F.2d 989, 997 (D.C. 1980). The duty

arises from a "special relationship" between the plaintiff and defendant created by

the nature of the contractual relationship. *Id.* at 1002.

### (ii)     *Breach and Injury to Appellant Proximately Caused by Breach*

To establish proximate cause, the plaintiff must present evidence that there

was a direct and substantial causal relationship between the defendant's breach and

the plaintiff's injuries. *District of Columbia v. Zuckerberg, 880 A. 2d 278, 281

(D.C. 1981)*. Furthermore, a plaintiff may meet his burden by offering direct or

circumstantial evidence. *Id.*

As can be expected, Appellees' wrongful conduct has caused Appellant to

experience severe emotional distress, as one who is living in the line of fire with a

target on his back.  Following Appellees' failure to prevent the spread of threats to

Appellant's life, Appellant has had to substantially alter his life in order to insure

his safety and that of his family and associates. Appellant has incurred substantial

costs, both personally and professionally, in making these necessary alterations.

Finally, Appellant has sufficiently pled Appellees' breach and the resulting

damages Appellant incurred and those allegations are more than sufficient, and

clearly provide Appellees adequate notice of the Complaint. Compl. ¶ 20; (JA 13).

As mentioned above, Appellees' express disclaimer provided in the

language of the Statement of Rights explicitly states, "We do our best to keep

Facebook safe…" thereby creating a duty owed to Appellant, by Appellees, to take reasonable steps to mitigate harmful and violent messages threatening the lives of Appellant and other Facebook users alike. The fact that Appellees' merely idly stood around, failing to take any timely action upon notification of the threatening and menacing message, supports the fact that Appellees breached its duty of "doing its best" to increase the safety of its website. Additionally, Appellees' unreasonable delay in removing the Third Intifada Posting while allowing further violent and murderous messages to be posted further underscores Appellees' negligence, gross negligence and recklessness. Compl. ¶19; (JA 13). Appellant was thus faced with fear of violent and deadly attacks on himself as well as on others who were also directly affected. Thus, in breaching its duty, Appellees caused Appellant actual harm. In addition, the other counts of the complaint are similarly well pled and the District Court's decision must be reversed.

## III.    THE DISTRICT COURT ERRED IN GRANTING APPELLEES' MOTION TO DISMISS UNDER FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6).

A motion to dismiss under Rule 12(b)(6) tests whether a complaint has properly stated a claim upon which relief may be granted. *Woodruff v. DiMario*, 197 F.R.D. 191, 193 (D.D.C. 2000). For a complaint to survive a Rule 12(b)(6) motion, Federal Rule of Civil Procedure 8(a) merely requires that it contain "a

short and plain statement of the claim showing that the pleader is entitled to relief."

Fed. R. Civ. P. 8(a)(2). Rule 8(a) does not require "detailed faltual allegations."

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-57 (2002). More specifically, "a

complaint must contain sufficient factual matter, accepted as true, to 'state a claim

to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)

(quoting *Twombly*, 550 U.S. at 570). A claim is facially plausible "when the

plaintiff pleads factual content that allows the court to draw [a] reasonable

inference that the defendant is liable for the misconduct alleged." *Id.* (citing

*Twombly*, 550 U.S. at 556).

Moreover, in evaluating a Rule 12(b)(6) motion, "[t]he complaint must be

liberally construed in favor of the plaintiff, who must be granted the benefit of all

inferences that can be derived from the facts alleged," *Schuler v. United States*,

617 F.2d 605, 608 (D.C. Cir. 1979). In considering a Rule 12(b)(6) motion, the

court is to "accept all factual allegations in the complaint as true and construe the

pleadings in the light most favorable to the nonmoving party." *Zynga*, WL

4569889 at 2, citing *Outdoor Media Group, Inc. v. City of Beaumont*, 506 F.3d

895, 899-900 (9th Cir.2007).

When dismissal is sought based on an affirmative defense, "the defense

clearly must appear on the face of the pleading." *Zynga*, WL 4569889 at 2, citing

*McCalden v. California Library Ass'n,* 995 F. 2d 1214, 1219 (9th Cir.1990). § 230

is an affirmative defense that a plaintiff is not required to plead around. *GTE Corp.*, 347 F. 3d at 657. Given the limited nature of a Rule 12(b)(6) challenge, a motion to dismiss based on CDA immunity should be denied when there is ambiguity. *Zynga*, WL 4569889 at 6 (denying a motion to dismiss based on CDA immunity because it was unclear whether the internet service provider would be considered an "interactive computer service provider" and whether it would fall under the "information content provider" exception).

Given the ambiguity regarding Facebook's status as a content provider and as providers of interactive computer services, in addition to the supported allegations of assault and negligence against Appellees, particularly in light of Appellees' failure to act despite a duty, these matters should be viewed in the light most favorable to the Appellant and thus, the District Court erred in granting Appellees' Motion to Dismiss.

## CONCLUSION

For the foregoing reasons, Appellant respectfully requests that this Court reverse the District Court's ruling in granting Appellees' Motion to Dismiss and to hold that Appellees are not immune from liability under the CDA for their tortious conduct. Rather, Appellees' conduct constitutes negligence and assault since Appellees allowed the Third Intifada Page, which advocated and encouraged a

Muslim attack on Jews to remain posted on their website. Moreover, despite having notice of the violent and threatening messages conveyed on the Third Intifada Page, Appellees repeatedly and unreasonably refused to remove the inciting and provoking page, simply because of Facebook's increased viewership and consequently, Appellees increased revenue.

Additionally, Appellant respectfully requests that this Court hold that Appellant has properly and sufficiently pled facts sufficient to establish causes of action for negligence and assault and thus, the District Court erred in dismissing this case pursuant to Federal Rule of Civil Procedure 12(b)(6). This case should respectfully be remanded to the District Court with instructions to enter a judgment finding liability on the part of Appellees, to enter an injunction against the Appellees, and to set a trial on damages.

**Oral argument is respectfully requested.**

Dated: October 25, 2013

Respectfully Submitted,


/s/ *Larry Klayman*
Larry Klayman, Esq.
D.C. Bar No. 334581
Klayman Law Firm
2020 Pennsylvania Ave. NW, Suite 345
Washington, DC 20006
Tel: (310) 595-0800
Email: leklayman@gmail.com

40

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 9,006 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and Circuit Rule 32. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally-spaced typeface using Microsoft Word 2007 in 14-point Times New Roman font.

Respectfully submitted,

/s/ *Larry Klayman*
Larry Klayman, Esq.
D.C. Bar No. 334581
Klayman Law Firm
2020 Pennsylvania Ave. NW, Suite 345
Washington, DC 20006
Tel: (310) 595-0800
Email: leklayman@gmail.com

41

## CERTIFICATE OF SERVICE

I hereby certify that October 25, 2013, I caused the foregoing document to be electronically filed with the Clerk of the Court for the United States Court of Appeals for the D.C. Circuit by using the appellate CM/ECF system. I further certify that on the same day, I served the foregoing document on the following counsel by electronic service via the CM/ECF system:

Craig S. Primis, P.C. (D.C. Bar No. 454796)
K. Winn Allen (D.C. Bar No. 1000530)
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, D.C. 20005
Telephone: (202) 879-5000
Facsimile: (202) 879-5200
craig.primis@kirkland.com
winn.allen@kirkland.com

Respectfully submitted,

/s/ *Larry Klayman*
Larry Klayman, Esq.
D.C. Bar No. 334581
Klayman Law Firm
2020 Pennsylvania Ave. NW, Suite 345
Washington, DC 20006
Tel: (310) 595-0800
Email: leklayman@gmail.com